**Max RALIS, Appellant,**

v.

**RFE/RL, INC.**

No. 84–5216.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 8, 1985.

Decided Aug. 16, 1985.

Amy E. Wind, Washington, D.C., with whom Irving Kator and Joseph B. Scott, Washington, D.C., were on brief, for appellant.

N. Frank Wiggins, Washington, D.C., with whom Ian D. Volner and Lawrence N. Cohn, Washington, D.C., were on brief, for appellee.

Before BORK, SCALIA and STARR, Circuit Judges.

STARR, Circuit Judge:

This appeal comes to us from the District Court's dismissal of a complaint brought under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34 (1982), by a U.S. citizen working overseas. As it reaches us, the appeal raises, among other things, questions as to the ADEA's applicability to U.S. citizens who had worked for U.S. employers outside the United States prior to Congress's recent expansion of the ADEA's protective coverage to Americans employed abroad. For the reasons that follow, we affirm the District Court's judgment dismissing the action.

I

According to his complaint, Dr. Max Ralis is a U.S. citizen domiciled in Orleans, France. Beginning in 1956 and continuing for twenty-five years, Dr. Ralis was employed in various radio programming positions in Europe by RFE/RL, Inc., which is better known by the names of its corporate predecessors, Radio Free Europe and Radio Liberty. In 1981, Dr. Ralis was involuntarily retired from his supervisory position in a small branch office of RFE/RL, Inc., solely on grounds of his having reached the corporation's mandatory retirement age of 65. Following his forced retirement, Dr. Ralis filed a charge of age discrimination with the EEOC and duly exhausted his administrative remedies.

A

Stymied in his quest for administrative relief, Dr. Ralis thereafter filed suit in United States District Court for the District of Columbia. His three-page complaint alleged that his involuntary termination of employment ran afoul of the ADEA, thereby warranting his reinstatement with back pay. Complaint at 3. RFE/RL, Inc. promptly filed a 12(b)(6) motion to dismiss, contending that the ADEA had no applicability to employment, such as Dr. Ralis's, performed outside the United States. Seizing upon the ADEA's incorporation in 29 U.S.C. § 626 (1982) of a jurisdiction-limiting provision of the Fair Labor Standards Act, 29 U.S.C. § 213(f) (1982), the defendant maintained that the ADEA's reach, unlike other federal anti-discrimination statutes, stopped by its express terms at the jurisdictional boundaries of another sovereign nation. That jurisdictional section provided simply that the FLSA, and hence the ADEA which expressly incorporated the provision, "shall not apply with respect to any employee whose services during the workweek are performed within a foreign country." Relying upon a then-recent district court decision, *Cleary v. United States Lines, Inc.,* 555 F.Supp. 1251 (D.N.J.1983) (subsequently affirmed by the Third Circuit, 728 F.2d 607 (3d Cir. 1984)), RFE/RL, Inc. argued that the plain terms of the ADEA restricted its reach to workplaces within the territorial limits of

the United States. As an American expatriate working in Europe for a quarter century, Dr. Ralis could not, RFL/RL, Inc. maintained, bring himself within the statute's coverage.

In response, Dr. Ralis argued, among other things, that the ADEA's territorial limitation had no applicability to a "government controlled corporation." Employees of "executive agencies (including those of government corporations or government controlled corporations)" were, Dr. Ralis observed, indisputably within the ADEA's reach. RFE/RL, Inc., the argument ran, was a "government controlled corporation" by virtue of the "high degree of governmental involvement in [its] purposes, operations and management." Plaintiff's Opposition at 5. That "high degree of governmental involvement" was evidenced, plaintiff argued, by (1) the existence of the Board for International Broadcasting ("BIB"), a statutorily created entity which controlled RFE/RL, Inc.; (2) various indicia of federal government control over RFE/RL, Inc., through (a) budget and funding approval requirements, (b) BIB authority over appointment of certain radio personnel, (c) BIB's oversight authority of RFE/RL's, Inc.'s management practices and the consistency of the stations' programming with American foreign policy, (d) as of 1982, the merger of the BIB and the RFE/RL Board of Directors; and (3) Presidential and Senatorial control by virtue of their appointment and confirmation powers with respect to the BIB members who in turn sit as members of the RFE/RL, Inc. board.

Candidly admitting Congress's intent to maintain RFE/RL's autonomy as to broadcasting matters, Dr. Ralis maintained that RFE/RL's "historical independence to administer the day-to-day operation of the radios" spoke only to the entity's status as a private corporation, as opposed to any status as a government-*owned* firm. It was, he argued, not ownership but *control* which the Government exercised by both the structural characteristics of RFE/RL's relationship to the BIB and by the latter's authority to direct RFE/RL's destiny.

The District Court rejected Dr. Ralis's arguments, concluding in a careful opinion (1) that the ADEA by its clear terms did not apply to workplaces, such as plaintiff's, situated within a foreign country, and (2) that while the ADEA did apply to "executive agencies," including "government controlled corporations," RFE/RL was not a "government controlled corporation." In reaching the latter conclusion, Judge Penn paid especial attention to statements in the statute and the legislative history that RFE/RL was a non-governmental entity. In merging the BIB and RFE/RL's Board of Directors in 1982, the court noted, Congress had flatly provided that the corporate restructuring "shall not be construed to make RFE/RL, Incorporated, a federal agency or instrumentality." 22 U.S.C. § 2880(b) (1982) (quoted in Memorandum Opinion at 4). Consistent with the statutory language itself, the Senate Report stated that the merger of the two boards left "intact the non-government status of the radio corporation," S.REP. No. 71, 97th Cong., 2d Sess., at 32, U.S.CODE CONG. & ADMIN.NEWS 1982, pp. 651, 683, and expressed the Senate Foreign Relations Committee's expectation that "the BIB will continue to respect the journalistic integrity of RFE/RL." *Id.* From all this, the District Court concluded that "Congress has made a determination to establish funding without government control over its operations." Memorandum Opinion at 4. Absent "extensive, detailed, and virtually day-to-day supervision [by BIB] over RFE/RL," the District Court held that Congress's clear intent that RFE/RL be a separate, non-controlled corporate entity demanded judicial respect "especially since [this activity] falls within the area of foreign relations." *Id.* at 4–5.

### B

During the pendency of the appeal which followed to this court, Congress amended the ADEA so as, among other things, to extend its reach to "citizen[s] of the United States employed by an employer in a work-

place in a foreign country." 98 Stat. 1767, 1792 (1984). This modification was signed into law by the President on October 9, 1984. Shortly before oral argument, the parties filed supplemental submissions with respect to the effect of this modification. Dr. Ralis argued that, while the ADEA was applicable to his 1981 involuntary retirement under the statute as it previously stood (and thus that the Third Circuit's *Cleary* case was wrongly decided), any uncertainty in this respect had been swept away by the 1984 amendment. Invoking the Supreme Court's decision in *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), Dr. Ralis contended that this court was duty bound to apply the law as it presently exists.

> '[A] court is to apply the law in effect at the time it renders its decision, unless doing so would result in a manifest injustice or there is statutory direction or legislative history to the contrary.'

Appellant's Supplemental Brief at 3 (quoting *Bradley, supra,* 416 U.S. at 711, 94 S.Ct. at 2016). Analyzing the facts at hand, Dr. Ralis discerned no "manifest injustice" nor contravention of statute or legislative history in the ADEA's reaching back, as it were, to 1981 to proscribe his being forced to retire. As to any "manifest injustice," Dr. Ralis pointed in particular to preexisting BIB regulations which expressly forbade RFE/RL from discriminating against employees on grounds of age. As Dr. Ralis put it:

> [B]y virtue of its obligations under BIB regulations, RFE/RL, Inc. was already bound not to discriminate on the basis of age. Acknowledging that the ADEA applies to employees working abroad, such as Dr. Ralis, would not result in "any unfair change in [RFE/RL Inc.'s] substantive rights or obligations." Therefore, no exception to the general rule of retroactive application of subsequently-enacted law is warranted here.

Appellant's Supplemental Brief at 6 (citation omitted).

In contrast to Dr. Ralis's contention that this new statutory obligation should apply retroactively, RFE/RL argued that the faithful application of the Supreme Court's teaching in *Bradley* would lead to the determination that a statute imposing *new obligations* on a private entity, such as the 1984 ADEA amendment, should not be so applied. In adopting the 1984 amendment, RFE/RL maintained, Congress was attempting to close a statutory loophole recognized in *Cleary,* a loophole which RFE/RL candidly admitted was "extensively relied on by employers." Appellee's Supplemental Brief at 4.

> Precisely because of this considerable reliance upon the state of the law prior to the 1984 amendment, it is manifestly unfair to impose retroactive liability for acts completely lawful when they were carried out.

*Id.*

## II

■ Upon analysis, we conclude that the issue of the ADEA amendment's retroactivity *vel non* cannot be pretermitted. First, we cannot accept Dr. Ralis's initial argument that the ADEA *sans* the 1984 amendment applied to his 1981 involuntary retirement from a European facility. The crystal clear language of the ADEA as it stood in 1981 admits of no reasonable reading other than that given to it by the federal district court and the Third Circuit in *Cleary* and by our own District Court in the case at hand. For reasons that are enshrouded in mystery, Congress saw fit to limit the ADEA's compass for many years to the territorial confines of the United States. In contrast to other statutes, including anti-discrimination measures such as Title VII of the 1964 Civil Rights Act, the pre-1984 ADEA's reach stopped where the jurisdiction of a foreign country began. To embrace Dr. Ralis's position would require us to rewrite the statute; this we cannot and will not do.

■ The second reason we must face Dr. Ralis's retroactivity argument is that we are firmly convinced, as was the District Court, that RFE/RL is not a "government controlled corporation" so as other-

wise to bring it under the pre-1984 ADEA. The common post-New Deal practice of the National Government's funding private entities simply does not, as a general proposition, bring a private actor within the legal "control" of the Government, a proposition candidly accepted by Dr. Ralis. *See Forsham v. Harris,* 445 U.S. 169, 180, 100 S.Ct. 977, 984, 63 L.Ed.2d 293 (1980) ("Grants of federal funds generally do not ... serve to convert the acts of the recipient from private acts to governmental acts absent extensive, detailed, and virtually day-to-day supervision."); *United States v. Orleans,* 425 U.S. 807, 818, 96 S.Ct. 1971, 1977, 48 L.Ed.2d 390 (1976).

█ The key to establishing "government control" is not identifying the source of RFE/RL's funding, but divining the intent of Congress as evidenced by, among other things, the situs of control over day-to-day operations. *See Rocap v. Indiek,* 539 F.2d 174, 176 (D.C.Cir.1976) (holding that the Federal Home Loan Corporation is a "government controlled corporation," and thus subject to FOIA, inasmuch as, among other things, the FHLC was "subject to such substantial federal control over its day-to-day operations."). *See also Railway Labor Executives Ass'n v. Consolidated Rail Corp.,* 580 F.Supp. 777, 778 (D.D.C. 1984). On that score, Congress spoke about the control of RFE/RL's operations quite as clearly as it did with respect to the ADEA's geographical reach. As the District Court correctly observed, Congress's intent has been manifest that Radio Free Europe and Radio Liberty are to enjoy independence in programming and broadcasting decisions, subject to the sensible limitation that their programming and broadcasting be consistent with the foreign policy of the United States. It was deemed important by Congress that institutional arrangements be such that the stations not lose their "non-official status"; to transform Radio Free Europe and Radio Liberty from independent broadcasters into house organs for the United States Government was seen as inimical to the fundamental mission of those stations. *See* H.R.REP. No. 510, 93d Cong., 1st Sess. 3–5 (1973),

*reprinted in* 1973 U.S.CODE CONG. & AD. NEWS 2271, 2272–74. *See also* 22 U.S.C. § 2880(b); S.REP. No. 71, 97th Cong., 2d Sess. 32 (1982), U.S.CODE CONG. & ADMIN. NEWS 1982, p. 683; S.REP. No. 194, 95th Cong., 1st Sess. 20 (1977), *reprinted in* 1977 U.S.CODE CONG. & AD.NEWS 1625, 1642–43.

Thus it was that the Board for International Broadcasting was given evaluative and review responsibilities with respect to the two stations, but day-to-day control was left to the stations themselves. Indeed, BIB regulations expressly prevent a governmental takeover of the stations' operational control; to the contrary, the BIB is charged with insuring the continuation of Radio Free Europe and Radio Liberty "as independent broadcast media with professional independence." 22 C.F.R. § 1300.1(b). To send the message of independence loud and clear, one BIB regulation, (captioned appropriately, "Independence of RFE/RL, Inc.") imposes the following hands-off limitation:

> The BIB shall not impose any prior constraint on programming, on the preparation of broadcast materials or on the manner in which those materials are broadcast by RFE/RL.

*Id.* § 1300.5(a). It is RFE/RL, not BIB, which is given responsibility for such functions as preparing policy guidelines, § 1300.6(b), for assuring compliance of its operations with such guidelines, § 1300.-6(c), and for the appointment, assignment, promotion and separation of its employees, § 1300.9. Even as to matters in which the leading role is conferred upon the BIB, such as relations with the Executive Branch and with the Congress and foreign governments, RFE/RL's operational independence is afforded protection: "Nothing [in § 1300.14] shall be construed to limit the normal exercise of professional duties by RFE/RL news, research and program personnel." § 1300.14(e).

█ Now this is emphatically not to say that the RFE/RL can operate oblivious to the viewpoints and decisions of the BIB,

particularly now that the former's board has been merged into the latter. The BIB is obviously an important and powerful actor on this stage, as Dr. Ralis understandably goes to some length to demonstrate. Appellant's Brief at 8–13. As we read the statute and regulations, however, the powers and duties of the BIB, albeit substantial, do not rise to the level of control of operations. That pivotal function was left by Congress's clear design to the state-chartered corporation which Congress stated in the statute was to continue "as an independent broadcast media." 22 U.S.C. § 2872(4). *See also id.* § 2873(b). In a sensitive area directly affecting the foreign relations of the United States, we in the "least dangerous branch" should not and will not compromise a structure carefully erected by the political branches.

### III

We are thus brought to the question which arose late in this litigation, namely whether the ADEA's new-found reach to foreign shores should apply to an event which occurred four years ago (and over three years before President Reagan signed the bill into law). We begin this final phase of our inquiry by reading the amendment itself to see what Congress had in mind. "[An employee under the ADEA] includes any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country." 98 Stat. 1767, 1792 (1984).

Suffice it to say that the statute is entirely silent on the point of our inquiry. This would seem not to be occasioned by oversight, for Congress flatly provided that one other amendment to the ADEA adopted at the same time (increasing the annual private retirement benefit level to be used in determining exemptions from the ADEA) was *not* to apply to persons retiring before enactment of the amendment. This would seem, standing alone, to argue in favor of the retroactive application of the ADEA's foreign-country coverage. Moreover, as Dr. Ralis strenuously argues, Senator Charles Grassley, the author of the 1984 amendments, stated that the amendments were meant to *clarify* the original meaning of the Act. Appellant's Supplemental Brief at 9.

■ But, the retrospective imposition of an obligation giving rise to a substantive liability is not lightly to be undertaken absent an express Congressional intent to render unlawful an act that was legal at the time it was done. In fact, merely to state the proposition that an *obligation-imposing* statute should be retroactively applied is to suggest the extraordinary nature of that notion.

### A

Long ago, Chief Justice John Marshall laid down a memorable teaching on retroactivity, one that has become a frequently-invoked maxim of our law. In his first Term, our third Chief Justice observed that "in mere private cases between individuals" the judiciary "ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties." *United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801). Chief Justice Marshall did not have occasion to follow that *dictum* in that case, since the *Schooner Peggy* litigation involved what the Court understandably called, as we shall presently see, "great national concerns." *Id.* But at the same time that case did not, in truth, involve what is at issue here, namely a retroactive imposition of a liability-creating obligation.

Briefly stated, the *Schooner Peggy* litigation arose out of an American ship's seizure of a French vessel near Port au Prince. In condemnation proceedings brought by the United States, the trial court had determined that the vessel was unarmed and not a lawful prize. The Circuit Court reversed, concluding to the contrary that the ship had in fact been armed and thus was subject to capture. The matter then came before the Supreme Court; during the pendency of the appeal, the United States entered into a convention with France providing that "[p]roperty captured, and not yet *definitively* condemned

... shall be mutually restored." 5 U.S. (1 Cranch) at 107 (emphasis in original). The Supreme Court felt obliged to apply the French-U.S. convention, even though by doing so the rights of the parties were obviously affected (to the consternation of the Executive and the crew of the U.S. vessel which had effected the seizure in the first instance and which would have shared in the value of the prize).

The distinction, however, between that case and ours is manifest. There, the issue of legal entitlement to the Schooner Peggy had not definitively been resolved by the courts prior to the effective date of the convention. The bilateral convention at issue there plainly affected the rights of the parties by its express terms; in our case, however, we have moved beyond the not inconsiderable point of "affecting rights" to the Draconian stage of retroactively imparting an obligation *cum* liability. Inasmuch as this is a private case between an individual and a privately chartered, albeit federally funded, corporation, it would seem from *Schooner Peggy* that we should struggle hard here to construe a statute silent as to retroactivity in a manner so as not to create a retrospective obligation.

Dr. Ralis, however, vigorously asserts that "the court must apply the law as it presently exists." Appellant's Supplemental Brief at 3. He sees in more recent cases a rule seemingly quite different than that which we have thus far discussed. *See, e.g., Bradley, supra; see also Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) (holding that a HUD circular—requiring notice of reasons for eviction be given to tenants in HUD-assisted housing projects—would apply to the eviction of a tenant whose judicial challenge to the eviction was pending at the time of the circular's issuance). That is, the ordinary rule even as to liability-creating statutes is, in Dr. Ralis's view, that a supervening statute should be applied on appeal, unless the specific exceptions enumerated by *Bradley* are satisfied (namely, manifest injustice, or contravention of the statute or the expressed intent of Congress). But upon

analysis, what Chief Justice Marshall was conveying in *Schooner Peggy* seems to be that which the more modern cases call a "manifest injustice."

**B**

The very notion of law is that known, or at least knowable, rules govern the conduct and affairs of those subject to the law's reach. It is quite incompatible with our fundamental notions of law that an act lawful at the time it was done can, at the stroke of the legislative pen, be rendered unlawful and the actor called to account for a completed, now-condemned deed in the halls of justice. In the criminal setting, we know such enactments by the familiar term *ex post facto,* a concept so repugnant to Eighteenth Century notions of enlightened government and elementary principles of justice that our forebears at the Founding expressly proscribed that sort of measure in the Constitution itself.

Retroactive impositions of civil liability are conceptually of a piece with *ex post facto* criminal laws. Instead of packing the actor off to jail, the legislature, with the judiciary's cooperation, more modestly requires the payment of sums of money and the reordering of affairs, such as here Dr. Ralis's prayer for back pay and reinstatement to a post filled over four years ago.

By virtue of the inherent repugnance of *ex post facto* imposition of civil liabilities, it is not surprising that the Supreme Court's teaching in this area is, upon analysis, decidedly unfriendly to statutory interpretations that would effect a latter-day burdening of a completed act—lawful at the time it was done—with retroactive liability. *See, e.g., Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); *Union Pacific Ry. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913) ("[T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past. The rule is one of obvious justice and prevents the assigning

of a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed.... [A] retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be 'the unequivocal and inflexible import of the terms and the manifest intention of the legislature.' ").

### C

In the main, Dr. Ralis relies on the Supreme Court's decision in *Bradley* for the proposition that the ADEA amendments here can properly invalidate—on pain of back pay and reinstatement—his forced retirement early on in this decade. We therefore pause to examine that case in some detail.

*Bradley*, of course, did not involve a private law suit at all. The Supreme Court decision there represented, rather, a way station in protracted litigation brought by black parents and guardians to bring about the desegregation of Richmond, Virginia's public schools. The suit, which had begun in 1961, was brought against the Richmond School Board. The specific question before the Court in 1974 was whether the Education Amendments of 1972, granting authority to federal courts to award a reasonable attorney's fee in school desegregation cases, could properly be applied to the then-pending litigation. The Court held that the statutory amendments could in fact apply to the case at hand. Reviewing the Supreme Court's precedents in this area, beginning with *Schooner Peggy* and coming forward to *Thorpe v. Housing Authority of Durham, supra,* the Court employed a tripartite standard with respect to when retroactive application would work a "manifest injustice." The specific considerations identified to guide judicial analysis in such matters were: "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." *Bradley*, 416 U.S. at 717, 94 S.Ct. at 2019.

Applying those considerations to the litigation before it, the Court, speaking through Justice Blackmun, set forth the following analysis. First, in contrast to what *Schooner Peggy* called "mere private cases" between individuals, "the parties [to the Richmond case] consist, on the one hand, of the School Board, a publicly funded governmental entity, and, on the other, a class of children whose constitutional right to a nondiscriminatory education has been advanced by this litigation." 416 U.S. at 718, 94 S.Ct. at 2019. The Court further emphasized that school desegregation litigation was far removed from routine private lawsuits:

> With the Board responsible for the education of the very students who brought suit against it to require that such education comport with constitutional standards ... the plaintiffs [in this litigation] may be recognized as having rendered substantial service both to the Board itself, by bringing it into compliance with its constitutional mandate, and to the community at large by securing for it the benefits assumed to flow from a nondiscriminatory educational system.

*Id.* (citation omitted). Further distinguishing the *Bradley* litigation from "mere private cases," the Court observed that, in school desegregation cases, a plaintiff could not recover damages. Permitting recovery of attorneys' fees would, as in public accommodation cases, further the vindication of important Congressional policies in an area where damages were unavailable to provide an incentive to institute actions to cure illegal conditions.

Second, *Bradley* took note of several decisions in which the Supreme Court had refused to apply retroactively an intervening statute. *E.g., Greene v. United States, supra; Union Pacific Ry. v. Laramie Stock Yards, supra.* Those cases involved circumstances where retrospective applicability "would infringe upon or deprive a person of a right that had matured or become unconditional." *Id.* at 720, 94 S.Ct. at 2020. No such matured or unconditional right was present in the *Richmond* school desegregation, the Court concluded; for example, the School Board as a public entity had no absolute entitlement to "funds allo-

cated to it by the taxpayers. These funds were essentially held in trust for the public...." *Id.*

Third, the Court considered whether new and unanticipated obligations were being imposed upon a party without notice or an opportunity to be heard. Just as in *Thorpe,* the Court concluded, "no increased burden" was being imposed on the School Board since the 1972 amendments in no wise altered the Board's "constitutional responsibility for providing pupils with a nondiscriminatory education." *Id.* at 721, 94 S.Ct. at 2021. Of especial relevance to our case, the Court specifically stated in this respect: "[T]here was no change [effected by the 1972 amendments] in the substantive obligation of the parties." *Id.* The 1972 Amendments did not, the Court emphasized, create a theretofore non-existent liability for attorneys' fees. Quite to the contrary, from the earliest days of the litigation in 1961 "the [School] Board engaged in a conscious course of conduct with the knowledge that, under different theories ... the Board could have been required to pay attorneys' fees." *Id.* In a word, rather that creating a whole new area of liability, the 1972 Amendments merely served to create "an additional basis or source" for a pre-existing potential liability. *Id. See also Womack v. Lynn,* 504 F.2d 267, 269 (D.C.Cir.1974) (Title VII's applicability to federal civil service employees, effected by Congress in 1972, given retroactive effect because the amendment was "merely a procedural statute that affects the *remedies* available to federal employees suffering from employment discrimination. Their *right* to be free of such discrimination has been assured for years.") (emphasis in original) (citations omitted).

### D

The analysis in *Bradley* buttresses the intuitive conclusion that a "manifest injustice" would be worked by applying the 1984 ADEA amendment to a corporation's personnel action taken in 1981. Indeed, all three prongs of the *Bradley* analysis argue against retroactively imposed liability: (1)

here, unlike in *Bradley,* the parties are private (an individual suing his corporate employer); (2) the action taken in 1981 was entirely consistent with federal statutory law in effect at that time; and (3) the effect of applying the 1984 amendment would be to give rise to a substantive change in the parties' legal rights and obligations.

This is not to say that Dr. Ralis's position on retroactivity is groundless. Far from it; we can readily see several points in his favor. The first is that RFE/RL, Inc. is not a garden-variety private party; it is, as we have seen, funded entirely by the federal government, carries on a public mission of broadcasting (consistent with U.S. foreign policy) into the countries of the Soviet bloc, and is overseen by a Presidentially-appointed Board of Directors subject to Senate confirmation and Congressional oversight. The second is that Dr. Ralis's suit is brought under an anti-discrimination statute passed (and now expanded) by Congress. The third is that the BIB's regulations in effect at the time of Dr. Ralis's retirement expressly forbade discrimination on grounds of age. The fourth (touching on Congressional intent, as opposed to the existence of "manifest injustice") is that Senator Grassley, the architect of the 1984 amendments, stated that the amendments were intended only to "clarify" the meaning of the Act as originally enacted.

These are not insubstantial points by any means, but we do not think they suffice to carry the day. In the first place, RFE/RL, Inc. is at bottom a non-governmental entity, a private, state-chartered corporation whose operational independence has been carefully protected by Congress. For all the reasons that have led us, like the District Court, to conclude that RFE/RL, Inc. is not a "government controlled corporation," we are reluctant to pierce its private-actor veil, as it were, through an alternative analytical mode. While its public funding obviously renders it similar in one respect to the Richmond School Board, the bedrock distinction remains that the latter was, in the words of the *Bradley* Court, a

"governmental entity." Congress has emphatically directed, as we have seen, that the broadcast company here, notwithstanding its public mission, is to be considered no such thing.

Secondly, the ADEA's application overseas, as important as it may understandably have been to Congress, represented a regulatory expansion into foreign workplaces previously covered by other federal anti-discrimination laws but not by the ADEA. An employer's right within another country's jurisdiction to conduct its personnel affairs as it saw fit in respect of age considerations had previously been left inviolate by Congress. Those management rights were "matured," in the words of the cases, *Greene v. United States*, 376 U.S. at 160, 84 S.Ct. at 621, in 1981, long prior to the 1984 amendment. This court, speaking through Judge McGowan, has had occasion to address this sort of concern:

> Persons and employers must be able to base their conduct on what they believe the law to be. Retroactive creation of legal responsibilities or abolition of legal rights risks unfairness because the retroactive change confounds the expectations upon which persons acted.

*Hastings v. Earth Satellite Corp.*, 628 F.2d 85, 93 (D.C.Cir.) (citation omitted), *cert. denied*, 449 U.S. 905, 101 S.Ct. 281, 66 L.Ed.2d 137 (1980). And, in contrast to the vindication of constitutional rights—the setting in *Bradley*—it is in no way to denigrate the ADEA to observe that it is a rather different genre of anti-discrimination statute. The ADEA in truth protects "younger" older people, but not all people on grounds of age—for, it is quite lawful to terminate an employee solely by reason of age at age seventy (and above), regardless of the vigor and ability of the seventy-year-old employee. (Indeed, for its first eleven years, the ADEA would not have provided any succor for Dr. Ralis inasmuch as its protections ceased upon an employee's sixty-fifth birthday). The ADEA, however humane its purposes, is simply not of a piece with what was at stake in *Bradley* —the constitutional right of school children to be free of *de jure* race discrimination

and, conversely, a state actor's fundamental duty to keep governmental institutions (armed with compulsory attendance laws) faithful to the commands of the Constitution.

Thirdly, the BIB regulation forbidding age discrimination cannot shoulder the weight of a law carrying a panoply of remedial devices enforceable by the judiciary. To begin with, it is most unlikely that the regulation can be read literally to forbid *all* age discrimination—even above the age of eighty, or below the age of twelve. It is reasonable to assume, therefore, that it had reference to age discrimination prohibited by United States law— which would mean that it adds nothing to Dr. Ralis's other arguments. In any case, the regulation represented the binding policy of the Board and the corporation, but not positive law of a type giving rise to obligations capable of vindication in a court of law. More basically, the regulation forbade age discrimination, yet it was not, of course, an actionable act of age discrimination under federal law to retire Dr. Ralis involuntarily in 1981. It was, rather, entirely consistent with the literal terms of the ADEA in 1981 to force Dr. Ralis to retire at age sixty-five. In all events, it would be passing strange indeed if a law which would otherwise not be retroactive were given—by means of judicial interpretation—spotty, varying retrospective effect to the extent that a corporation had a binding policy forbidding age discrimination even as against an unprotected class of employees. Law, or more precisely a system of National law, should be more uniform and consistent than would exist under such a crazy-quilt pattern. *Cf. Mackey v. United States*, 401 U.S. 667, 676–77, 91 S.Ct. 1160, 1165, 28 L.Ed.2d 404 (1971) (separate opinion of Harlan, J.).

Finally, as to Congress's intent, Senator Grassley's statement as to the "clarifying" nature of the 1984 amendment simply cannot be taken as expressive of the intent of an earlier Congress (of which he was not even a part) which enacted the ADEA. Moreover, as Dr. Ralis concedes, the Sen-

ate Subcommittee chaired by Senator Grassley "received testimony from two witnesses requesting that any amendments be applied retroactively," Appellant's Supplemental Brief at 9, yet retroactive effect was not expressly given. One Senator's remark, in the face of Congressional silence in this respect, cannot carry the day.

We conclude, for the reasons stated, that the 1984 amendment expanding the ADEA's compass to foreign jurisdictions should not be retroactively applied. Inasmuch as the pre-1984 statute did not apply to RFE/RL, Inc., a private entity which is not a "government controlled corporation," we hold that the ADEA had no applicability to Dr. Ralis's involuntary retirement in 1981.

*Affirmed.*