NATIONAL SCIENCE AND LAW
CENTER, INC., Plaintiff,

v.

LEGAL SERVICES CORPORATION,
et al., Defendants.

Civ. No. 87–2151.

United States District Court,
District of Columbia.

Dec. 7, 1987.

Hamilton P. Fox, Washington, D.C., for plaintiff.

Andrew D. Koblenz, Washington, D.C., for defendants.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

This case is before the Court on Defendants' Motion for Summary Judgment and Plaintiff's Cross Motion for Summary Judgment. Plaintiff, the National Social Science and Law Center, Inc. ("the Center" or "NSSLC") seeks declaratory and injunctive relief to prevent the termination of plaintiff's funding by defendants, Legal Services Corporation ("LSC" or "the Corporation") and its President, John H. Bayly, Jr.

## BACKGROUND

The LSC is a non-profit corporation established in the District of Columbia by the Legal Services Act, 42 U.S.C. § 2966, *et seq.* Its mandate is to provide financial support for legal assistance in non-criminal proceedings to persons who are financially unable to afford such assistance. The Cor-

poration administers a program of grants or contracts disbursing federal funds to approximately 323 organizations which in turn provide free legal advice and representation to eligible clients.

The Center is a private non-profit corporation organized in 1977 under the laws of the District of Columbia. NSSLC is one of 17 "national support centers" funded by the Corporation. Each support center provides specialized assistance to attorneys in legal services organizations or private attorneys rendering *pro bono* legal services. Within this network, the Center's area of expertise is to provide social science research and related empirical data to legal services offices in the field and to other support centers. The Center is also authorized to undertake related research activities, including assistance in management and priority setting activities, training, development of manuals for the field, and preparation of publications on issues relating to social science and poverty law. Since 1978, NSSLC has received funds from LSC to provide social science services to LSC programs. In 1983, the Center received $253,416 from LSC; in 1984 it received $289,173; and in 1985 it received $320,722.

In March of 1986, LSC sent a monitoring team composed of four individuals [1] to review the activities and operations of the Center during the period beginning June 1983 through December 1983. The monitoring team spent approximately one week reviewing records and conducting interviews. The monitoring team's activities consisted of a review of documents in the Center's files, interviews with NSSLC staff and a few current and former members of NSSLC's Board of Directors. During the monitoring visit, NSSLC staff made available the financial records, case files, and related materials that were requested by the monitors.

A draft monitoring report setting forth the LSC team's preliminary findings was released to the Center for comment in late July 1986. The draft report contained allegations that the Center had engaged in activities in violation of LSC regulations and that the Center was generally inept and inefficient in carrying out its social science and technical assistance functions. The Corporation agreed to allow NSSLC until September 12, 1986, to respond to the findings set forth in the draft monitoring report, and the Center met that deadline by filing its comments on September 12, 1986. Although the Center's comments on the monitors' draft report were not due until September 12, 1986, the Corporation initiated a formal denial-of-refunding proceeding on September 5, 1986.[2]

On September 12, 1987, the Center submitted detailed comments on the draft monitoring report. In its response, the Center alleged that the draft report contained numerous factual errors and improper interpretations and applications of LSC statutes and regulations. The Center also asserted that it had performed economical and effective services of high quality under its grant agreement in accordance with applicable statutes, regulations, and grant conditions.[3]

The bases for the Corporation's decision to seek to deny refunding of the Center, as described in the Corporation's Statement of Factual Grounds for Denial of Refunding fell into three categories: (1) failure to conduct the financial affairs of the Center in a responsible fashion and inadequate management; (2) failure to comply with the Legal Services Corporation Act and the

---

1. The team consisted of Susan Sparks, Team Leader and LSC in-house monitoring analyst; Nicholas Eberstadt, a social scientist; Frank Booker, Assistant Dean of the University of Notre Dame Law School; and Michael Bush, LSC auditor.

2. Since the Corporation set this procedural schedule, it is not apparent from the record why the Corporation took its precipitant action rather than waiting a few more days for the Center's comments. However, the Court concurs with the finding of the Hearing Examiner that this action by the Corporation is insignificant with regard to these proceedings.

3. The affidavits of the monitoring team, upon which the Corporation relied in initiating the September 5, 1986 denial of refunding proceeding, largely repeated the preliminary findings reflected in the draft monitoring report. All of these affidavits were prepared before the Center had an opportunity to submit its September 12, 1986 comments on the draft monitoring report.

Corporation's regulations; and (3) failure to provide economical and effective legal assistance of high quality.[4]

Following receipt of the denial of refunding, the Center, on October 6, 1986, exercised its right to request a hearing pursuant to 45 C.F.R. § 1625.5. The Honorable George R. Gallagher, a Senior Judge of the District of Columbia Court of Appeals, was designated by the Corporation to preside as the Hearing Examiner.[5] The denial-of-refunding hearing began on October 17, 1986 and concluded on December 12, 1986. In addition to contesting the factual allegations in the affidavits derived from the 1986 draft monitoring report, the Center raised procedural objections based on its contention that the Corporation had failed to give the Center notice and an opportunity to correct pursuant to LSC regulations. The hearing included approximately 12 days of testimony as well as the presentation of substantial documentary evidence. Following the hearing, in December 1986, both parties submitted proposed findings of fact and conclusions of law and post-hearing briefs. Also, at the request of the Hearing Examiner, the Center and the Corporation submitted supplemental briefs on the issue of whether the Center was entitled to notice and an opportunity to correct as a pre-condition of denial of refunding.

The Recommended Decision of the Hearing Examiner was issued on June 19, 1987. The Hearing Examiner determined that the notice and opportunity to correct provision was not a procedural prerequisite to the initiation of the proceeding because the nature of the facts and circumstances of the case revealed that the Center "could not reasonably have been unaware of its deficiencies." Judge Gallagher added that notice and opportunity to correct was not required here and the Corporation's failure to provide it was not material since the Center had been informed by LSC of its underutilization and resultant low productivity as early as the 1979 monitoring reports.

Second, the Hearing Examiner concluded that NSSLC should be denied refunding on the ground that the Center was underutilized and that the number of social science work products generated by the Center during the monitoring period (June 1983—December 1985) was not sufficient to justify refunding. The Recommended Decision based this conclusion on the fact that the evidence demonstrated that the Center did not make economical and effective use of its grant funds during the review period. The record before the Hearing Examiner indicated the parties' stipulation that during the 31 month review period the Center produced 281 pieces of work product with a staff averaging 4–5 social science researchers. From this data, it was calculated that the Center produced about nine individual pieces of social science work product per month, or less than 2.5 pieces per week. These figures do not include projects begun before the review period and continued through the review period. The Hearing Examiner also found that the Center's Deputy Director characterized 143 pieces of the Center's work product as "non-written" social science work. Although the Recommended Decision noted that the testimony was often in conflict regarding the estimates of time spent on typical work products, Judge Gallagher acknowledged the great lengths that the Center's witness went to in stressing the amount of time and effort required to respond to field requests. He concluded that in spite of this the Center did not effectively refute the LSC's showing of the paucity of work performed by the Center in proportion to the amount of the funds granted to it.

---

4. On September 10, 1986, three days after issuing its notice of denial of refunding and two days before the Center had filed its comments on the draft monitoring report, the Corporation issued a press release denouncing the Center's level of service as "pathetic" and "an affront to the poor and the taxpayers".

5. In response to Center's request that the denial-of-refunding proceeding be stayed so that the Corporation could consider the Center's comments and issue a properly corrected final report, the Corporation informed the Center that it would issue a final monitoring report only after the conclusion of the administrative proceedings pending before Judge Gallagher.

Finally, the Hearing Examiner rejected the Corporation's claim that the Center should be denied refunding because of noncompliance with LSC requirements or because of failure to provide high quality social science technical assistance. He found that there was substantial compliance with LSC requirements and that the Center generally produced social science products of professional quality.

On July 1, 1987, the Center sought review of the Recommended Decision by defendant John H.Bayly, Jr., in his capacity as President of LSC, pursuant to 45 C.F.R. § 1625.11(c).[6] The Center asked that the Recommended Decision be reversed since it provided sufficient social science technical assistance to qualify for refunding. NSSLC's primary contentions included that the Hearing Examiner had committed legal error in rejecting the Center's procedural objection with respect to notice and an opportunity to correct, and further asserted that the Hearing Examiner's findings on the issue of underutilization and insufficient quantity of work were arbitrary.

Defendant Bayly issued the Corporation's "Final Decision" on July 8, 1987. The Final Decision adopted the Hearing Examiner's Recommended Decision concluding that the Center should be denied refunding because of insufficient quantity of work product. In doing so, the LSC President stated that under the current provision of section 1625.3(c)[7] notice and opportunity to correct are not required. Second, even under the previous version of the regulation, the Center did not qualify for notice and an opportunity to correct. Finally, he found that regardless of which regulation controlled, the Center had received notice of its deficiencies and thus had the opportunity to correct them.

The Final Decision also modified the Recommended Decision by adding two independent grounds for the denial of refunding. The first is that the Center allegedly failed to use its Executive Director in the provision of social science services and therefore did not make economical and effective use of its LSC grant monies in violation of § 1625.3(b)[8]. Second, Mr. Bayly found that the Center had significantly failed to comply with LSC regulations and grant conditions by using LSC funds to subsidize the Center's contract to provide social science services to the Maryland Public Service Commission ("MPSC") also in violation of § 1625.3(b). With respect to Bayly's additional findings concerning the Executive Director and the MPSC, the Final Decision acknowledged that the Hearing Examiner did not reach any conclusion regarding the Executive Director and the Recommended Decision concluded that the MPSC contract did not provide a basis for denial

6. Section 1625.11(c) delineates the scope of the President's review and it provides in pertinent part: "... the President shall adopt, modify, or reverse the recommended decision, or direct further consideration of the matter. In the event of modification or reversal, the President's decision shall conform to the requirements of § 1625.10(b)." Section 1625.10(b) provides: "The initial decision shall be part of the record and shall include a statement of findings and conclusions, and the reasons or basis therefor, on all material issues of fact, law, or discretion presented on the record."

7. Until May 1987, § 1625.3(c) provided in relevant part that refunding could be denied when:

There has been significant failure by a recipient to use its resources to provide economical and effective legal assistance of high quality as measured by generally accepted professional standards, the provisions of the act, or a rule, regulations, or guideline issued by the Corporation. In the absence of unusual circumstances, refunding shall not be denied for this cause unless the Corporation has given the recipient notice of such failure and an opportunity to take effective corrective action[.]

Effective May 29, 1986, the second sentence of § 1625.3(c) was revised to provide:

If the recipient could not reasonably be expected to have prevented or corrected its failure without notice from the Corporation and an opportunity to have taken effective corrective action, refunding shall not be denied for this cause unless the Corporation has given the recipient such notice and opportunity[.]

8. Section 1625.3(b) provides for the denial of refunding where "[t]here has been significant failure by a recipient to comply with a provision of law, or a rule, regulation, guideline or instruction issued by the Corporation, or a term or condition of a current or prior grant from or contract with the Corporation[.]" Notice and an opportunity to correct is not required for denial of refunding under § 1625.3(b).

of refunding. In response to the Final Decision plaintiff instituted this action challenging the final decision of LSC to terminate funding.

## I.

■ For purpose of judicial review, LSC is not a federal agency under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. However, courts have found judicial review of LSC action available. *Spokane County Legal Services v. LSC,* 614 F.2d 662, 669 (9th Cir.1980); *National Clients Council v. LSC,* 617 F.Supp. 480 (D.D.C.1985). This district accepts the *Spokane County* analysis, but has equated its standard roughly to the "arbitrary and capricious" test of section 706 of the APA. *Western Center on Law and Poverty, Inc. v. LSC,* 592 F.Supp. 338, 342–43 (D.D.C. 1984). Thus, while it is true that the Corporation's decisions do not have to meet the requirements of the APA *per se,* the LSC must, at a minimum, articulate a rational basis for its administrative decisions. *National Senior Citizens Law Center v. LSC,* 581 F.Supp. 1362, 1371 (D.D.C.1984), *aff'd,* 751 F.2d 1391 (D.C.Cir.1985).

In a similar proceeding between the LSC and another national support center, Judge Hogan of this Court held that the standards of review analogous to those in the APA are appropriate in the LSC defunding context. *National Clients Council,* 617 F.Supp. at 485. Under this analysis, issues of law and procedure are properly before this Court *de novo. Id.* Further, with respect to the review of evidence presented at the administrative hearing, the issue for this Court is "whether, considering *all* of the evidence introduced at the hearing, ... there was a rational basis for the decision rendered." *Id.* (emphasis in original) (citations omitted); *see also National Senior Citizens Law Center, Inc. v. LSC,* 581 F.Supp. 1362, 1371 (D.D.C.1984).[9] Accord-

ingly, the Court will address both the substantive and procedural issues below.

## II.

■ The Center asserts that the Corporation failed to give it any notice or opportunity to correct its alleged deficiencies, as required by 45 C.F.R. § 1625.3(c) (1985) ("the 1985 version").[10] Under the 1985 version, notice and opportunity to correct were required absent "unusual circumstances." The Center contends that since there was no such finding by the Corporation in its Statement of Grounds for Denial of Refunding or by the Hearing Examiner, no unusual circumstances exist. According to the Center, unusual circumstances are to be determined with respect to the usual circumstances of the recipient in previous grant periods. Against this background NSSLC argues that it has increased its utilization and productivity. In contrast, LSC contends that 45 C.F.R. § 1625.3(c) (1986) ("the 1986 version" or "the current version") governs. This procedural dispute stems from the fact that the 1986 version became effective after the monitoring period but before the Corporation instituted denial of refunding proceeding.

The Corporation correctly asserts that the general rule regarding revisions in regulations is that a tribunal is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary. *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *Ralis v. RFE/RL, Inc.,* 770 F.2d 1121, 1127 (D.C. Cir.1985). Here, there is neither express direction in the subject regulation nor legislative history indicating that the former regulation governs unless the subsequently promulgated regulation's retroactive effect would result in manifest injustice.

---

9. Plaintiff has alleged that LSC's action denying refunding to NSSLC is the product of both LSC policy directives and political bias, however, the Court need not determine this issue since the record does not indicate that this issue was presented to the Hearing Examiner.

10. Both parties contend in the alternative that their position is supported by either version of § 1625.3(c).

The *Bradley* Court enumerated three factors to be considered in assessing whether manifest injustice would occur: "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." 416 U.S. at 717, 94 S.Ct. at 2019. This Circuit recently applied the *Bradley* test in *Ralis*. 770 F.2d at 1129. In *Ralis*, the plaintiff, an American citizen domiciled in France, sued his employer under the Age Discrimination in Employment Act ("ADEA"), claiming that his involuntary retirement was discriminatory. At the time his suit was brought, ADEA did not extend to private employment performed in foreign countries; but during the pendency of his action, ADEA was amended to reach such cases. The District of Columbia Circuit declined to apply the amendment to the plaintiff, finding that to do so would be manifestly unjust because the amendment had affected a substantive change in the parties' legal rights and obligations. *Ralis*, 770 F.2d at 1129. Using this analysis, the Center contends that the current version of 1625.3(c) modifies the Center's prior right to a "second chance" through notice and an opportunity to correct. The Center argues that under *Ralis* it is unreasonable and manifestly unjust to penalize it after the fact for failing to have in place self-appraisal procedures that were not obligatory during the period of review. In response, LSC asserts that the *Ralis* Court distinguished between amendments that effect changes in substantive rights or obligations and those that merely alter procedural rights. Additionally, LSC contends that *Ralis* is consistent with *Womack v. Lynn*, 504 F.2d 267, 269 (D.C.Cir.1974), where this Circuit held that the statutory change merely altered the procedural remedies appurtenant to a pre-existing right,

and held that the statute as amended applied.

After evaluating the relative merits of the parties' contentions, the Court concludes that the current version of § 1625.3(c) does no manifest injustice to the Center.[11] Although the Center correctly states that the parties herein are private entities,[12] the second and third prong of the *Bradley* test weigh against the Center. Regardless of which version of § 1625.3 is applied to these facts two points are evident. First, under either version, the grant recipient was required to use its resources to provide economical and effective legal assistance. The parties do not disagree on this point. Second, neither version gives the Center an absolute right to notice and an opportunity to correct. Thus, the Center has not been deprived of any matured or unconditional right. *See Ralis*, 770 F.2d at 1128. From the record before this Court, one could rationally find that the Center "could not reasonably have been unaware" of its deficiencies *or* that the Center's deficiencies were unusual[13]. There is no contention that these findings are mutually exclusive in this case. Although the Center chooses to define the usual in terms of the Center's practices, the fact remains that the Center's inability to provide both effective and economical legal assistance appears to constitute an unusual occurrence. This does not mean that the Center was professionally incapable of performing this task, but that the record indicates the Center's lack of success in providing cost effective assistance in proportion to the amount of grant money received.

### III.

■ The primary substantive issue in this case is whether the Final Decision,

11. In light of this holding, there is no need to address whether the Center received actual notice of its deficiencies in previous LSC monitoring reports.

12. In *Ralis*, the key to establishing "government control" is not by identifying the source of the entity's funding, but divining the intent of Congress as evidenced by, among other things, the situs of control over day-to-day operations. *Ralis*, 770 F.2d at 1125.

13. Defendant Bayly found the presence of unusual circumstances required by the 1985 version of the regulation. Since LSC regulations only confine the scope of the President's Final Decision to issues presented on the record, therefore this finding need only be supported by the record. 45 C.F.R. §§ 1625.11(c), 1625.10(b).

which adopts most of the findings of the Hearing Examiner, was arbitrary and capricious in its findings regarding the underutilization of the Center. Based on the evidence at the hearing and the Hearing Examiner's Recommended Decision, the LSC President premised his decision to deny funding on three independent grounds. First, the Center failed to provide economical and effective legal assistance in that it failed to produce a sufficient amount of work. Second, the Center failed to provide economical and effective legal assistance to the extent that its executive director engaged in activities other than those for which LSC grant funds are intended. Third, the Center failed to comply with applicable statutes, regulations and contractual provisions in that it improperly employed LSC grant funds to subsidize activities for which those monies could not properly be used.

In its papers, the Center vigorously asserts that the Corporation never imposed any numerical benchmark on its productivity. Further the Center suggests that without specific quantitative standards, the appropriate question is whether NSSLC's productivity increased during the period of review. Under the Center's view, the emphasis placed on the number of social science work products generated during the period of review penalizes NSSLC for time committed to major research projects. Accordingly, NSSLC contends that the relative weight of different categories of work products based on complexity and sophistication was not given proper weight. Also, the Center challenges the experience of at least one member of the monitoring team in providing social science research to legal services lawyers. Finally, the Center dismisses the Final Decision's additional grounds for denial of refunding as spurious.

Contrary to the Center's contentions, the Corporation maintains that the Final Decision is not based on an assertion that 281 products, or any other number of projects, are in the abstract too few. Rather, the Final Decision was based on what the Center did with the time of its professional staff, largely as depicted by the Center's witness. Much of the Final Decision relies on the testimony of Dr. Barbara Linden, the Center's Deputy Director, who studied the Center's records to determine how much time was spent on each of 124 Center projects. Her analysis, which LSC contends confirms the fact that the Center failed to make economical and effective use of its federal grants, included the following points: The Center's employees worked an average of 1,950 hours during 1985; during that same year, the Center employed 5 social scientists excluding the Center's Executive Director; if the Center's total 1985 spending is divided by the total number of hours worked by its employees, a figure of $23.17 is derived as the average per hour cost for the Center's time. Dr. Linden's figures do not take into account work during 1985 or projects begun in periods before the monitoring visit; social science work products in the most sophisticated category of work took an average of 44.5 working hours to produce. Both the LSC President and the Hearing Examiner concluded that 1985 was the busiest year for the Center. From these figures, the LSC President drew several conclusions in his Final Decision:

1. Even if every one of the 124 projects begun in 1985 took as long to complete as did the average project in the most sophisticated category, a total of 5,518 hours would have been spent on the 124 projects. This would require 2.8 social scientists on [a] full time basis.

2. The five active social scientist were employed for a total of 9,750 hours during 1985. For each of the 124 projects, therefore, the Center employed an active social scientist for more than 78 hours. As even the most sophisticated projects averaged only 44.5 hours to complete, more than 34 hours of unproductive professional time are associated with each project.

3. Even if every one of the 124 projects costs as much to produce as the average project in the most-sophisticated category ($1,031.06), the total cost of all the projects would be $127,851.44. Thus, of the $316,331 LSC funds spent by the

Center in 1985, only 40% (or less) was spent on the projects that assertedly constituted the Center's principal workload and reason for existence.

It is clear from the record that neither the Hearing Examiner nor the LSC President simply counted the number of social science projects produced by the Center, they both considered a wide range of testimony and exhibits. Indeed both of them cited to the testimony given by the Center in support of their finding that the Center significantly failed to make economical and effective use of its grant money. Finally, the record indicates that in some instances, the figures most favorable to the Center were utilized, yet the result was still the same. On these facts, it is apparent that on the issue of underutilization there was a rational basis for the decision to deny refunding.[14]

For the foregoing reasons, the Court concludes that plaintiff's Motion for Summary Judgment must be denied and defendant's Motion for Summary Judgment must be granted. An appropriate Order has been issued.

---

14. In light of the Court's finding on the primary issue, there is no need to address whether LSC's independent additional grounds constitute valid grounds for denial of refunding.