Jorge ALEDO–GARCIA,
Plaintiff, Appellant,

v.

PUERTO RICO NATIONAL GUARD
FUND, INC., et al., Defendants,
Appellees.

No. 88–1427.

United States Court of Appeals,
First Circuit.

Heard Oct. 3, 1989.

Decided Oct. 16, 1989.

Jose Enrique Colon Santana, Rio Piedras, P.R., for plaintiff, appellant.

Roberto Torres Gonzalez with whom Deliz & Torres Gonzalez was on brief, for defendants, appellees.

Before COFFIN, Circuit Judge, BROWN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

JOHN R. BROWN, Circuit Judge.

*Age—Creeping Up*

This case raises, as the sole issue, the question of the "retroactive" application of the 1986 amendment to the Age Discrimination in Employment Act (ADEA)[1] to the dismissal of a 70 year old employee from the position of Warehouse General Supervisor for stores run by the Puerto Rico National Guard Fund (the Fund).

The trial court held that Congress's removal of the upper age limit, effective January 1, 1987, was inapplicable to Aledo–Garcia who was mandatorily retired effective December 31, 1986. We reverse the decision of the trial court granting summary judgment for the Fund and remand for trial.

*Retroactive? Prospective? Which?*

The Fund argues that Aledo–Garcia's discharge was effective as of December 31, 1986 and that the October 31, 1986 amendment of the ADEA to afford its protection to those over 70 years, effective January 1, 1987, cannot now be applied to Aledo–Garcia. It is ironic that all of the legal writing on the subject uses the term "retroactive." It is not really retroactive—i.e. going back to a time prior to the enactment of the questioned legislative act. Rather, here the problem is whether the act fully effective as of the time the case is heard and decided should govern conduct occurring before the stated effective date. Finally, the usual rubric that a court should apply the law which is effective at the time of hearing/decision is of little help where, as here, there is no doubt that the October Amendments were then in full effect, the question remaining being whether its stated effective date controlled its application for a time prior to that. However slippery, ill defined or uncertain the term retroactive might be, we continue to use it in the traditional sense or perhaps, more accurately, nonsense.

The controlling law on this subject for federal legislation has been handed down from the United States Supreme Court in *Bradley v. Richmond School Board*,[2] and followed by this Circuit in *New England Power Co. v. U.S.*[3] In *Bradley*, the Court stated that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."[4]

■ Although the principle is not absolute,[5] under *Bradley*, a trial court applies a two pronged test, and unless it can determine either that (i) manifest injustice will result, or (ii) there is statutory direction or legislative history indicating that the applicable law is the old law, it should apply the law in existence at the time it renders its decision.

*Injustice—How Manifest?*

Under *Bradley*, manifest injustice is examined in light of three factors, (i) the nature and identity of the parties, (ii) the

---

* Of the Fifth Circuit, sitting by designation.

1. 29 U.S.C. §§ 621–634.

2. 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

3. 693 F.2d 239, 244–45 (1st Cir.1982).

4. 416 U.S. at 711, 94 S.Ct. at 2016, 40 L.Ed.2d at 488.

5. The D.C. Circuit has written,

Long ago, Chief Justice John Marshall laid down a memorable teaching on retroactivity, one that has become a frequently-invoked maxim of our law ... that "in mere private cases between individuals" the judiciary "ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties."

*Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1126 (D.C. Cir.1985), quoting *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49, 51 (1801).

nature of their rights, and (iii) the nature of the impact of the change in the law upon those rights.[6]

### The Parties—Their Nature, Public or Private?

■ Under (i) we must make a determination regarding the nature of the parties before the court. Justice Marshall's words, as quoted in *Ralis* (n. 4, supra), reflect that a distinction exists between public and private parties, and that if the party against whom the statute is to be applied is a public party, then the "struggle" against the so-called retroactive application is not as hard.

The Fund argues that it is a private, non-profit corporation organized under the General Corporation Law of the Commonwealth of Puerto Rico.[7] The Fund operates post exchanges and canteens for the benefit of military and police forces in Puerto Rico and their families. The post exchanges and canteens are operated in public facilities leased from the government of Puerto Rico. The corporation's profits are used to provide tuition assistance, life insurance, and social and cultural amenities to the Commonwealth's military and police groups. The Fund does not receive any direct governmental aid or financial assistance.

■ We do not accept the Fund's characterization of itself as a private organization. The Fund fulfills a wider public purpose by providing facilities to a specific group of public employees, the Commonwealth military and police forces and members of their families. Moreover, although the Fund is incorporated under the general

business statutes of Puerto Rico, it is actually authorized under Puerto Rico's military code.[8]

Given the purpose of the organization, to help people in military service, which benefits society in general, and the official involvement of the Puerto Rican military hierarchy in the activities of the Fund, the Fund serves a wider public purpose and is, in effect, a public entity.

We hold, therefore, that as the Fund is a public entity, the greater protection against retroactivity ordinarily afforded a truly private organization in accordance with Chief Justice Marshall's directions, is inapplicable in this case. Thus, the application of the law as amended is not unduly burdensome.

We point out that, although $1,000,000 in actual and $5,000,000 in punitive damages, as sought in the complaint, could be construed as potentially resulting in manifest injustice to the Fund, the punitive damages requested could not be awarded because the question regarding which law to apply is a real issue in controversy, and the actual damages are limited under the ADEA to primarily lost wages.[9]

■ Lost wages under the ADEA are generally determined as being the difference between what was actually earned and what would have been earned but for the illegally discriminatory act.[10] The amount of wages that could have been earned includes the wage rate illegally denied multiplied by the period of time the wage was illegally denied, plus the value of any fringe benefits such as life insurance, pension benefits, medical insurance, and any other benefits generally provided by

---

**6.** 416 U.S. at 717, 94 S.Ct. at 2019, 40 L.Ed.2d at 491–492.

**7.** P.R.Laws Ann. Title 14, § 1101 *et seq.* (1976).

**8.** P.R.Laws Ann. Title 25, § 2087 (1987), (Section 2087 authorizes the operation of post exchanges and canteens in the barracks of the military forces of Puerto Rico. The operation of the post exchanges are to be carried out in accordance with regulations promulgated by the Adjutant General. The Adjutant General and the Secretary of the Treasury are jointly responsible for the regulation of the sale of alcohol at the stores. Finally, it is the Adjutant General, a

public official, who is authorized to use the income from the stores and may do so to promote the "esprit de corps" of the Puerto Rican military forces.).

**9.** The ADEA provides that "amounts owing to an individual as a result of a violation of this Act shall be deemed to be unpaid wages and overtime compensation for the purposes of sections 216 and 217 of this title...." 29 U.S.C. § 626(b).

**10.** M. Player, Employment Discrimination Law, § 6.24 (1988).

the employer.[11] From this aggregate total of denied compensation is deducted any amounts earned by the plaintiff during the affected period.

■ Liquidated damages equal to back pay are available in addition to back pay as a form of punitive damages, but are generally only paid when the employer "willfully" disregards the law, willful being defined as reckless.[12] In the instant case, there is no such willful disregard as the application of the amended law was a real question in controversy.

Thus, the potential $6,000,000 award requested by Aledo–Garcia will not result in manifest injustice because, for the forthcoming trial, we declare that it is not legally sustainable.

### What Are the Affected Rights?

An examination of the nature of the rights affected likewise does not demonstrate that the Fund is being subjected to substantial injustice. The right of the Fund that was affected was the right to fire Aledo–Garcia solely because of his age. The right Aledo–Garcia has is the right to continued employment, in the absence of any non-discriminatory factors that might legitimately support a decision to terminate his services, without consideration as to his age, a right that the amended law recognizes.

### How Bad Does It Hurt?

■ The third aspect of the test, the impact of the application of the amended law on the circumstances of Aledo–Garcia's firing, stems from the concern regarding

the application of new and unanticipated obligations upon a party. As this Court has written,

> [u]nder the manifest injustice standard the disappointment of private expectations that results from the implementation of a new rule must be balanced against public interest in the enforcement of that rule.

*New England Power,* 693 F.2d at 245 (citations omitted). Thus, we must balance the right of the Fund to fire an employee solely for reasons of age, a right that was not unconditional after October 31, 1986, against the right of that employee to continue his employment under the protection of the ADEA as amended. Given that the burden we are imposing is on a public agency and that the relative rights are the right to employment free of age discrimination versus the right to fire an employee solely because of his age, we are persuaded that the balance swings in favor of the aging Aledo–Garcia.

### Say What You Mean … Or Mean What You Say?

The question of clear Congressional intent is somewhat obscured by the fact that while an effective date sometimes means that the law is to have prospective effect only,[13] in this case there is some indication in the legislative history that Congress desired more immediate relief. Congressman Biaggi expressed the belief that the need for the amendment was immediate as both those who were about to reach the age of 70 *and* those who had already done so needed the relief of the amendment.[14] Moreover, when Congress acts in response to a perceived jurisdictional gap, the courts

11. *Id.*

12. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).

13. In *Bradley,* the Court applied "retroactively" a provision of the Educational Amendments of 1972 in order to allow for the recovery of legal fees for services rendered between March 10, 1970, and January 29, 1971. The provisions that the Court was applying retroactively *had a prospective effective date* of July 1, 1972. 416 U.S. at 709, 94 S.Ct. at 2015. The Court was not concerned with the effective date of the legisla-

tion but rather with explicit statutory language prohibiting retroactive application. *See, e.g.,* 416 U.S. at 715 n. 21, 94 S.Ct. at 2018 n. 21. Finding none, the Court held that a presumption of retroactivity should apply. Although the legislation was silent on the issue, there was an indication in the legislative history of that statute that Congress had decided against providing for only prospective application.

14. *Individual Views of the Honorable Mario Biaggi of New York,* Age Discrimination in Employment Amendments of 1986, H.R.Rep. No. 756, 99th Cong., 2d Sess. 5628 (1986).

**358**

generally are empowered to apply *Bradley* and *New England Power*.[15]

*Summary Judgment Summarily Wrong*

Examining the firing of Aledo–Garcia in light of these factors we conclude that, under *Bradley*, the amended law should have been applied by the trial court so summary judgment in favor of the Fund was wrong and should be reversed.

REVERSED AND REMANDED.

---

15. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1084 (1st Cir.1986) ("We hold, therefore, that at least where Congress has expanded the jurisdiction of the courts in response to a perceived gap in a statutory jurisdictional scheme, it is proper for us to apply the rule of *New England Power* and *Bradley*.").