CHEMICAL WASTE MANAGEMENT, INC., Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent,

Hazardous Waste Treatment Council, American Mining Congress, American Iron and Steel Institute, The International Metals Reclamation Company, Inc., Intervenors.

HAZARDOUS WASTE TREATMENT COUNCIL, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent,

Chemical Manufacturers Association, American Petroleum Institute, American Mining Congress, American Iron and Steel Institute, The International Metals Reclamation Company, Inc., Intervenors.

CHEMICAL MANUFACTURERS ASSOCIATION, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent,

Hazardous Waste Treatment Council, Intervenor.

BROWNING–FERRIS INDUSTRIES, INC., Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.

NATIONAL SOLID WASTE MANAGEMENT ASSOCIATION, INC. and Waste Management of North America, Inc., Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Lee M. Thomas, Administrator, Respondents,

Hazardous Waste Treatment Council, Intervenor.

AMERICAN IRON AND STEEL INSTITUTE, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.

AMERICAN IRON AND STEEL INSTITUTE, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.

CHEMICAL MANUFACTURERS ASSOCIATION, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.

AMERICAN WOOD PRESERVERS INSTITUTE, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.

E.I. DU PONT DE NEMOURS & COMPANY, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent,

Hazardous Waste Treatment Council, Intervenor.

MONSANTO COMPANY, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.

THE DOW CHEMICAL COMPANY, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.

AMERICAN MINING CONGRESS, Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.

ROSS INCINERATION SERVICES, INC., Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent,

American Iron & Steel Institute, Intervenor.

Nos. 88–1581, 88–1578, 88–1591, 88–1592, 88–1600, 88–1604 to 88–1607, 88–1615, 88–1643, 88–1735, 88–1736 and 88–1784.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 31, 1989.

Decided March 14, 1989.

As Amended April 21, 1989.

Angus Macbeth and Richard A. Flye, with whom Lawrence S. Ebner and John C. Chambers, Jr., Washington, D.C., were on the brief, for petitioners.

J. Brian Molloy, Douglas H. Green and Joan Z. Bernstein, Washington, D.C., also entered appearances for petitioner in No. 88–1581.

David R. Case, Washington, D.C., also entered an appearance, for petitioner in No. 88–1578 and for intervenor, Hazardous Waste Treatment Council, in Nos. 88–1591, 88–1581, 88–1600, 88–1643.

John T. Smith II, Washington, D.C., also entered an appearance, for petitioner in Nos. 88–1591, 88–1643, 88–1607, 88–1721, and for intervenor Chemical Mfrs. Ass'n in No. 88–1578.

Kevin A. Gaynor, Washington, D.C., also entered an appearance, for petitioner in No. 88–1592.

Samuel I. Gutter, Washington, D.C., also entered an appearance, for petitioner in No. 88–1600.

Steven F. Hirsch, and Barton C. Green, Washington, D.C., also entered appearances, for petitioner in Nos. 88–1604, 88–1665.

Karl S. Bourdeau also entered an appearance for petitioner in Nos. 88–1604, 88–1655 and 88–1735.

David F. Zoll, Washington, D.C., also entered an appearance, for petitioner in No. 88–1607 and for intervenor, Chemical Mfrs. Ass'n in No. 88–1578.

John N. Hanson and Edward M. Green, Washington, D.C., also entered appearances, for petitioner in No. 88–1736 and for intervenor American Mining Congress in No. 88–1581.

Richard D. Panza and Thomas A. Downie, Lorain, Ohio, also entered appearances, for petitioner in No. 88–1784.

Daniel S. Goodman, Atty., Dept. of Justice, with whom Roger J. Marzulla, Asst. Atty. Gen., Dept. of Justice, and Steven E.

Silverman, Atty., U.S. E.P.A., Washington, D.C., were on the brief, for respondent.

Lisa F. Ryan, Atty., Dept. of Justice, Washington, D.C., also entered an appearance, for respondent in No. 88–1581.

Thomas R. Bartman, Atty., Dept. of Justice, Washington, D.C., also entered an appearance, for respondent in No. 88–1784.

G. William Frick, James Jackson, Washington, D.C., and Ralph J. Colleli, Jr. were on the brief, for intervenor American Petroleum Institute in No. 88–1578.

Neil J. King, Washington, D.C., and Raymond B. Ludwiszewski, Newington, Conn., entered appearances, for intervenor The Intern. Metals Reclamation Co., Inc. in Nos. 88–1581 and 88–1578.

Donald J. Patterson, Jr., Washington, D.C., and Roderick T. Dwyer entered appearances, for intervenor American Mining Congress in No. 88–1581.

Gary H. Baise, Karl S. Bourdeau and Steven F. Hirsch, Washington, D.C., entered appearances, for intervenor American Iron and Steel Institute in Nos. 88–1581, 88–1578 and 88–1784.

Before: WALD, Chief Judge and MIKVA, Circuit Judge, and REVERCOMB,[*] District Judge.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Petitioners[1] in this case challenge two regulatory provisions dealing with the treatment and disposal of hazardous waste established by the Environmental Protection Agency ("EPA" or "the agency") pursuant to the Resource Conservation and Recovery Act of 1976 ("RCRA" or "the Act"). The petitioners claim that the contested regulations are arbitrary and capricious, and that they were issued without adequate notice and comment as required

by the Administrative Procedure Act ("APA"). We conclude that the challenged regulations are reasonable and that petitioners' notice and comment challenge is without merit. Accordingly, the petition for review is denied.

## I. FACTS

### A. *Applicable Statute and Regulations*

This dispute involves a rulemaking initiated by the EPA under the RCRA. Subtitle C of the Act, 42 U.S.C. §§ 6921–34, establishes a comprehensive framework regulating the treatment and disposal of hazardous wastes. Pursuant to its statutory mandate, the EPA has adopted a two-part definition of the term "hazardous waste." First, the agency has published several lists of specific "listed" hazardous wastes. 40 C.F.R. Part 261, Subpart D. Second, the agency has issued rules providing that any solid waste which demonstrates any one of four characteristics—ignitability, corrosivity, reactivity, and extraction procedure toxicity—will be considered a "characteristic" hazardous waste. 40 C.F.R. Part 261, Subpart C. The Act provides that any facility which treats, stores, or disposes of a listed or characteristic hazardous waste must first obtain a permit. 42 U.S.C. § 6925.

The RCRA was recently modified by the Hazardous Solid Waste Amendments of 1984 (the "1984 Amendments"), which established sweeping restrictions on the land disposal of hazardous wastes. The EPA was required to establish a schedule dividing the hazardous wastes into "thirds," *see* 42 U.S.C. § 6924(g)(4); the agency promulgated the schedule in May of 1986.[2] *See* 51 Fed.Reg. 19,300 (May 28, 1986). The division of the schedule into thirds was designed as a means of phasing in the land disposal restrictions. By August 8, 1988, the EPA was required to promulgate treat-

---

[*] The Honorable George H. Revercomb, of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

[1] Petitioners are numerous companies and industry associations, principally engaged in

chemical manufacturing and hazardous waste treatment.

[2] That schedule, however, is not irrevocable: the agency retains a continuing authority to shift particular wastes from one third of the schedule to another.

ment standards for each of the first-third scheduled wastes; these wastes may not be land disposed unless they have been treated to meet the applicable standards or the disposal unit is one from which there will be no migration of hazardous constituents for as long as the waste remains hazardous. *See* 42 U.S.C. § 6924(g)(4)(A). Similar land disposal restrictions for second-third and third-third wastes are scheduled to take effect on June 8, 1989 and May 8, 1990; prior to these dates, the EPA is required to promulgate treatment standards for the scheduled wastes.[3] *See* 42 U.S.C. §§ 6924(g)(4)(B), 6924(g)(4)(C).

The present dispute concerns the rulemaking in which the EPA established treatment standards for first-third wastes. The new regulations were submitted for public comment in two Notices of Proposed Rulemaking, which were published in the Federal Register on April 8, 1988 and May 17, 1988. *See* 53 Fed.Reg. 11,741; 53 Fed.Reg. 17,577. The final rule was published in the Federal Register on August 17, 1988, with an effective date of August 8, 1988. *See* 53 Fed.Reg. 31,137. In these public notices the EPA issued treatment standards for the various wastes; in lengthy preambles to the notices, the agency discussed the interpretive principles which would guide its application of the standards. Three such principles merit discussion here.

One of these principles concerns the treatment standards applicable to leachate produced from hazardous waste. Leachate is produced when liquids, such as rainwater, percolate through wastes stored in a landfill. The resulting fluid will contain suspended components drawn from the original waste. Proper leachate management involves the storage of wastes in lined containers so that leachate may be collected before it seeps into soil or groundwater. The leachate will periodically be pumped out of the container and subsequently treated.

An EPA regulation promulgated in 1980, known as the "derived-from rule," provided that "any solid waste generated from the treatment, storage, or disposal of a hazardous waste, including any sludge, spill residue, ash, emission control dust, or leachate (but not including precipitation run-off) is a hazardous waste." 40 C.F.R. § 261.3 (c)(2)(i).[4] Thus, for some years prior to the 1988 rulemaking, it had been understood that leachate derived from a hazardous waste was itself a hazardous waste. In the 1988 preambles, the agency stated that leachate derived from multiple hazardous wastes would be deemed to contain each of the wastes from which it was generated, and that it must therefore be treated to meet the applicable treatment standards for each of the underlying wastes.[5] *See* 53 Fed.Reg. 31,146–31,150 (August 17, 1988). This is known as the "waste code carry-through" principle.

The second interpretive principle at issue in this proceeding also involves the treatment requirements for hazardous waste leachate. In its preamble to the August rule, the agency stated that "[h]azardous waste listings are retroactive, so that once

---

**3.** The statute also contains fallback provisions which take effect if the agency fails to set treatment standards by the appropriate deadlines. If treatment standards for first-third and second-third wastes have not been promulgated by the applicable dates, the statute's "soft hammer" provisions take effect. Under the "soft hammer" provisions, land disposal of these wastes is permitted only if (1) the facility meets the technological requirements of 42 U.S.C. § 6924(*o*), and (2) the generator of the waste has certified that land disposal "is the only practical alternative to treatment currently available." *See* 42 U.S.C. §§ 6924(g)(6)(A), 6924(g)(6)(B). If the EPA fails to set treatment standards for a hazardous waste by May 8, 1990—the deadline for the promulgation of third-third treatment standards—then "such hazardous waste shall be pro-

hibited from land disposal." *See* 42 U.S.C. § 6924(g)(6)(C).

**4.** Petitioners in this proceeding do not challenge the validity of the derived-from rule itself. That rule was, however, challenged contemporaneously by other parties. Due to protracted negotiations between those parties and the agency, that challenge is only now reaching this court. *See Shell Oil v. EPA*, No. 80–1532 (D.C.Cir.). As we explain *infra,* our disposition of this case does not require that we express any view concerning the validity of the derived-from rule.

**5.** Since different wastes will typically be stored together in a landfill, it is not uncommon for leachate to be derived from many different wastes.

a particular waste is listed, all wastes meeting that description are hazardous wastes no matter when disposed." 53 Fed.Reg. 31,147 (August 17, 1988). The implications of that statement center around wastes which were not deemed hazardous at the time they were disposed but which are subsequently listed as hazardous wastes. The RCRA does not require that such wastes be cleaned up or moved from the landfill, nor does the agency impose any retroactive penalty on the prior disposal of the waste. Under the August rule, however, the agency announced that leachate which is actively managed after the underlying wastes have been listed as hazardous will itself be deemed a hazardous waste and must be treated to the applicable standards. Under this approach, the fact that the original waste was not deemed hazardous at the time of disposal is simply irrelevant in determining the treatment requirements for the leachate.

Finally, the agency discussed the applicability of the treatment standards to contaminated environmental media such as soil and groundwater. The preamble stated that "[i]n these cases, the mixture is deemed to be the listed waste." 53 Fed. Reg. 31,142 (August 17, 1988). Thus, when a listed hazardous waste (or hazardous waste leachate) is mixed with soil or groundwater—as may occur, for example, through spills or leaking—the soil or groundwater is subject to all the treatment standards or restrictions that would be applicable to the original waste.

## B. *The Present Litigation*

Immediately after the issuance of the challenged regulations, the petitioners filed a Motion for Emergency Stay Pending Review of the August rule by this court. On August 18, 1988, this court stayed enforcement of the rule "only as it applies to leachate and anything contaminated by leachate." That order was amended by the court on September 23, 1988 to provide that the stay would apply "to leachate, residues from treating such leachate, and groundwater contaminated with leachate." The court also established an expedited briefing schedule for "leachate-related issues" im-

plicated by the various challenges to the August rule. Briefs were filed, and oral argument was set for January 31, 1989.

Petitioners in this case raised a host of substantive and procedural challenges to the August rulemaking. First, the petitioners contested the agency's determination that "derived-from" wastes (such as leachate) will be subject to the standards applicable to each of the underlying wastes. The petitioners' position was in essence that the EPA should establish separate treatment standards for leachate, based on a leachate treatability study, rather than assuming that leachate can be treated to the standards for all of the wastes from which it is generated. The petitioners also challenged the application of the treatment standards to leachate derived from wastes which were not deemed hazardous at the time they were disposed; their claim was that such a regulation would constitute improper "retroactive" rulemaking. They also contested the agency's statement that environmental media contaminated by listed hazardous wastes would themselves be considered hazardous wastes and would be required to meet the treatment standards. Finally, the petitioners contended that the challenged regulations had been promulgated in violation of the notice and comment requirements of the APA.

Shortly before oral argument, however, the posture of the case changed dramatically. On January 27, 1989, the parties filed an Emergency Joint Motion to Defer Oral Argument on Certain Leachate–Related Issues. That motion, which was granted by this court, covered the petitioners' challenge to the waste code carry-through principle—the requirement that derived-from wastes such as leachate would be deemed to contain each of the original wastes from which they were generated. The parties also requested that argument be deferred on the notice and comment challenge, insofar as it pertained to the waste code carry-through principle. The explanation for the parties' request was that settlement negotiations had already produced agreement on some preliminary issues, and that a negoti-

ated settlement seemed likely on all issues pertaining to the waste code carry-through principle. Under the terms of the proposed settlement, all multiple-waste leachate would be rescheduled to the third-third, and a leachate treatability study would be undertaken so that appropriate treatment standards could be determined. *See* Emergency Joint Motion at 2, 3.

The issues argued to the court, and the issues that we decide today, are therefore limited to the following. First, did the agency improperly engage in retroactive rulemaking in ordering that its leachate regulations be made applicable to leachate derived from wastes which were not deemed hazardous at the time they were disposed? Second, did the agency act in an arbitrary and capricious manner by mandating that environmental media contaminated by hazardous wastes must themselves be treated as hazardous wastes? Finally, did the EPA fail to provide interested parties with adequate notice of and opportunity to comment on the foregoing regulatory principles?

## II. ANALYSIS

### A. *"Retroactive" Hazardous Waste Listings*

#### 1. Ripeness

■ The impending settlement of some but not all of the issues originally scheduled for argument has introduced an anomaly into the parties' disagreement concerning the "retroactivity" of hazardous waste listings. The parties continue to differ as to the applicability of EPA treatment standards to leachate derived from wastes which were not deemed hazardous when they were disposed. If the settlement is finalized, however, treatment standards for multiple waste stream leachate—leachate

derived from more than one hazardous waste—will not be promulgated until 1990. Much of the argument, therefore, concerns the question whether these standards, *when they are eventually promulgated,* can legitimately be applied to leachate derived from wastes listed as hazardous subsequent to their disposal. We must first determine whether this question is currently ripe for judicial review.[6]

■ As the Supreme Court has stated, the ripeness doctrine's

> basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). A determination of ripeness "requires the court to balance its interest in deciding the issue in a more concrete setting against the hardship to the parties caused by delaying review." *Webb v. Department of Health and Human Services,* 696 F.2d 101, 106 (D.C.Cir.1982). Of particular relevance to the present case are decisions which address the reviewability of agency actions which threaten to cause harm at some point in the future. On the one hand, "[t]he mere *potential* for future injury ... is insufficient to render an issue ripe for review." *Alascom, Inc. v. FCC,* 727 F.2d 1212, 1217 (D.C.Cir.1984) (empha-

---

6. The EPA has not suggested that this issue is unripe for judicial review. In fact, the Emergency Joint Motion, submitted both by petitioners and by the agency, asserted that this issue (as well as the issue of contaminated environmental media) is "severable from the issues sought to be deferred.... All petitioners and respondent agree that argument on these remaining issues should be held as scheduled." Emergency Joint Motion at 4. This fact is sure-

ly relevant: it belies any fear that immediate review will disrupt the administrative process, and such disruption is a central concern of the ripeness inquiry. However, since the ripeness doctrine also serves judicial interests in avoiding unnecessary or premature litigation, it is appropriate that this court consider the question even though the issue has not been raised by the parties.

sis in original). On the other hand, "where the likelihood of future harm is demonstrably high, it is often appropriate for courts to intervene before the feared event occurs." *Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 234 (D.C.Cir.1988); *see also Wilderness Society v. Griles*, 824 F.2d 4, 10–12 (D.C.Cir.1987). In the present case, several factors lead us to conclude that this question is currently ripe for judicial review.

First, it is clear that the EPA pronouncement at issue here constitutes "final agency action" within the meaning of 5 U.S.C. § 704. One function of the ripeness doctrine is to provide an agency "full opportunity ... to correct errors or modify positions in the course of a proceeding." *Public Citizen Health Research Group v. Commissioner, Food & Drug Administration*, 740 F.2d 21, 31 (D.C.Cir.1984). It seems quite clear to us, however, that the EPA has arrived at its ultimate decision on this issue. It is true that certain related questions—most notably, the specific treatment standards to be applied to hazardous waste leachate—have yet to be resolved. These questions, however, are logically distinct from the issue of "retroactivity." The EPA's determination of appropriate treatment standards will not involve agency reconsideration of the "retroactivity" principle. Nor is there any plausible basis for believing that the specific treatment standards eventually promulgated will affect this court's judgment as to the propriety of applying those standards to leachate derived from wastes which were deemed hazardous after their disposal.

Second, the EPA's announcement of the "retroactivity" principle is not without immediate consequences for the petitioners. By the terms of the proposed settlement, the agency is free at any time to require that single-waste leachate be treated to meet the standards promulgated for the underlying waste.[7] The petitioners would thus appear to be entitled to an immediate determination as to whether these standards may be applied to single-waste leachate derived from wastes which had not been listed at the time of disposal. Moreover, the application of the "retroactivity" principle to multiple-waste leachate may mean that some such leachate will fall under the definition of "hazardous waste" when it would not otherwise be so regarded. The requirement that this leachate be treated as "hazardous waste" will impose significant regulatory obligations even in the absence of specific treatment standards.[8]

Certainly the most severe consequences of the "retroactivity" principle will not be felt until the agency promulgates treatment standards for mixed-waste leachate. Even those consequences, however, are by no means speculative or conjectural. By rescheduling mixed-waste leachates to the third-third, the agency has postponed its obligation to set specific treatment standards. It has not, however, postponed that obligation indefinitely. The EPA is required by law to set treatment standards for third-third wastes by May 8, 1990. Even if the only consequences of the "retroactivity" principle would be felt in the future, we would conclude that the pros-

---

7. The Emergency Joint Motion states that the "EPA may at any time move this Court to exclude any single-source leachate from coverage by the stay and the undersigned petitioners will not oppose such motion." Emergency Joint Motion at 3.

8. Most obviously, the designation of particular leachate as "hazardous waste" will impose restrictions on the range of facilities to which petitioners may turn for leachate treatment. In general, hazardous waste may be treated only by facilities which have RCRA permits. The agency has suggested, however, that "[f]acilities collecting hazardous leachate can manage the leachate in such a way as not to trigger subtitle C requirements (including the land disposal re-

strictions) by managing the leachate in tanks at facilities subject to regulation under the Clean Water Act (see § 264.1(g)(6)). Consequently, [our interpretation] most directly discourages subsequent management in surface impoundments." 53 Fed.Reg. 31,149 (August 17, 1988). The petitioners dispute the EPA's assessment, contending that treatment in tanks regulated under the Clean Water Act is not in fact a practicable alternative. *See* Brief for Consolidated Petitioners at 12. Petitioners and the agency both agree, however, that fewer treatment options exist for leachate which is deemed a hazardous waste than for leachate which is not.

pect of these consequences is sufficiently certain to warrant immediate judicial review.

The posture in which this issue presents itself is admittedly a somewhat peculiar one. To a large extent, this court is being asked to pass upon the validity of interpretive principles which will govern the application of standards that have yet to be promulgated. Nevertheless, we conclude that this question is ripe for our review. The agency has plainly issued its final pronouncement on the subject, and its further deliberations on related issues will not serve to inform this court's consideration of this question. The agency's decision is likely to impose some immediate consequences on the petitioners. The most significant consequences, it is true, will not be felt immediately, but even these are not speculative: they are certain to occur by a clearly determinable time in the near (if not immediate) future. Under these circumstances, no purpose would be served by delaying our decision. All parties would be inconvenienced, and judicial resources would in the long run be unnecessarily burdened, if we required that this issue be re-briefed and re-argued to a future panel. Accordingly, we proceed to consideration of petitioners' challenge.

### 2. Notice and Comment

In contending that the "retroactivity" principle was promulgated in violation of the APA's notice and comment requirements, the petitioners make two distinct arguments. First, they contend that the notice given was inadequate because it consisted only of brief references which were "buried" within lengthy preambles in the Notices of Proposed Rulemaking. Second, the petitioners assert that the opportunity for comment was illusory, since the rulemaking record reveals that "[t]he Agency's mind obviously was made up," see Brief for Consolidated Petitioners at 48, and that the EPA was "simply unready to hear new argument" on these issues. See McLouth Steel Products Corp. v. Thomas, 838 F.2d 1317, 1321 (D.C.Cir.1988). We reject both challenges to the notice and comment procedures used by the agency in this case.

First, it is not clear to us that the agency was compelled in this case to comply with the notice and comment requirements of the APA. The APA provides that these requirements are inapplicable to "interpretive rules," see 5 U.S.C. § 553(b). The distinction between interpretive (or "interpretative") and substantive (or "legislative") rules is admittedly far from crystal-clear. See American Hospital Association v. Bowen, 834 F.2d 1037, 1045 (D.C.Cir.1987) ("the spectrum between a clearly interpretive rule and a clearly substantive one is a hazy continuum"). In general, though, our cases (and those of other circuits) have emphasized the distinction between rules which create new legal obligations and those which simply restate or clarify existing statutes or regulations. See American Hospital Association, 834 F.2d at 1045–46, and cases cited therein.

■ Given that standard, it would appear to us that the "retroactivity" principle is an interpretive rule. The derived-from rule, on the books since 1980, provides that "any solid waste generated from the treatment, storage, or disposal of a hazardous waste, including any ... leachate ... is a hazardous waste." 40 C.F.R. § 261.3(c)(2)(i). The agency's position is that the hazardousness of a waste does not depend upon the time it was disposed, and that therefore leachate derived from any waste which is now recognized as hazardous will have been "generated from the treatment, storage, or disposal of a hazardous waste." This seems to us an entirely reasonable (if not inevitable) construction of the regulation, and we therefore believe that, even had the agency failed to provide notice and an opportunity for comment, its action could be sustained.

■ We need not rest on that proposition, however, for in our view the agency did in fact provide the notice and opportunity for comment which the APA requires for the promulgation of substantive rules. The agency clearly stated the "retroactivity" principle in its preamble to the second Notice of Proposed Rulemaking. See 53 Fed.Reg. 17,586 (May 17, 1988). Admitted-

ly, the language used by the EPA did not explicitly solicit comments on this question. Indeed, the Notice appeared to treat this principle as an accomplished fact. The Notice stated that the "EPA confirms its long-standing interpretation that residues (leachate, for example) that derive from treatment, storage, or disposal of wastes that were disposed before the effective date of the listing are nevertheless subject to the derived-from rule. These residues therefore could become subject to the land disposal ban for the listed waste from which they derive if they are managed actively after the effective date of the land disposal prohibition for the underlying waste." 53 Fed.Reg. 17,586 (May 17, 1988). Admittedly, the agency's statement assumes rather than invites comments on this issue. Nevertheless, the public Notice did provide interested parties with a clear indication of the agency's intended course of action, and in fact the agency received numerous comments on this question.[9] Certainly the passage dealing with this issue comprised only a small percentage of a lengthy preamble to the Notice of Proposed Rulemaking. But whenever a rulemaking involves numerous discrete issues, it is almost inevitable that agency discussion of particular questions will be brief in comparison to the documents as a whole. This does not render public notice insufficient.

Of course, if the agency had ignored the comments it received—if it had simply reasserted its previous position that this principle was a "long-standing interpretation"—then it could not claim to have complied with the APA's notice and comment requirements. It would then be forced to rely exclusively on its contention that the

regulatory principle at issue here is an interpretive rule. In announcing its final rule, however, the agency extensively discussed the objections it had received, and it cogently explained its reasons for concluding that leachate derived from wastes listed as hazardous after their disposal should be considered hazardous wastes. *See* 53 Fed.Reg. 31,147–31,149 (August 17, 1988). Although the Notice of Proposed Rulemaking might have suggested that the agency's mind was made up, its subsequent statements reflect a willingness to consider and respond to public comment.

■ We see no contradiction, moreover, between the agency's contention that notice and comment were not required in this instance (since an interpretive rule was involved) and its argument that the APA's notice and comment provisions were in fact satisfied. Certainly the EPA cannot be faulted for attempting to provide clarification of a pre-existing regulation. Nor do we believe that the agency, by considering and responding to comments received, has somehow waived its right to argue that the regulation in question is an interpretive rule. We therefore reject the petitioners' argument that the agency's disposition of this issue was in violation of the APA's notice and comment requirements.

### 3. Merits

■ We observe at the outset that the agency has to a certain extent brought its troubles on itself. Both in its second Notice of Proposed Rulemaking and in its explanation of the final rule, the EPA asserted that "hazardous waste listings are retroactive." *See* 53 Fed.Reg. 17,586 (May

---

9. In finding that the agency's published notice was inadequate, the *McLouth* court was principally concerned with the fact that the "Summary" at the beginning of the notice of proposed rulemaking "would not have alerted a reader to the stakes." 838 F.2d at 1323. We find no such deficiency in the present case. At the beginning of its two Notices of Proposed Rulemaking, the agency included outlines, just over a page in length, summarizing the issues to be addressed in the proposed rule. These outlines contained headings and subheadings which clearly indicated that the Notices would discuss the applicability of the treatment standards to derived-

from wastes. *See* 53 Fed.Reg. 11,742 (April 8, 1988); *id.* at 17,578 (May 17, 1988). The outline to the second Notice, in fact, contained a subheading stating that "Residues from Managing Listed Wastes, or that Contain Listed Wastes, are Covered by the Prohibitions for the Listed Waste." *Id.* at 17,578 (subheading 7.c.). Of course the outline did not alert the reader to every scrap of information contained in the full Notice; if it had, it would not have been an outline. We nevertheless believe that the outlines, and the Notices, were sufficiently informative to satisfy the requirements of the APA.

17, 1988); *id.* at 31,147 (August 17, 1988). Petitioners argue that the EPA lacks the authority to promulgate retroactive regulations, and they correctly observe that such regulations are disfavored. *See Ralis v. RFE/RL, Inc.,* 770 F.2d 1121 (D.C.Cir. 1985). In our view, however, the crucial question is not whether the EPA is authorized to promulgate a retroactive rule. Rather, the crucial question is whether the challenged regulation in fact operates retroactively. We conclude that it does not.

In discussing the presumption against retroactive lawmaking, this court has noted that "the Supreme Court's teaching in this area is, upon analysis, decidedly unfriendly to statutory interpretations that would effect a latter-day burdening of a completed act—lawful at the time it was done—with retroactive liability." *Ralis,* 770 F.2d at 1127. It is plain, however, that the regulation with which we are confronted here is not retroactive as that term was used in *Ralis.* The agency has made no effort to impose a legal penalty on the disposal of waste which was not deemed hazardous at the time it was disposed. Nor, in fact, does this regulation require the cleanup of any newly listed hazardous wastes. The preamble to the final rule expressly provides that "these residues could become subject to the land disposal restrictions for the listed waste from which they derive *if they are managed actively after the effective date of the land disposal prohibition for the underlying waste.*" 53 Fed.Reg. 31,148 (August 17, 1988) (emphasis supplied). The rule has prospective effect only: treatment or disposal of leachate will be subject to the regulation only if that treatment or disposal occurs after the promulgation of applicable treatment standards.

As a practical matter, of course, a landfill operator has little choice but to collect and manage its leachate. Active management of leachate is sound environmental practice, and a panoply of regulations require it.[10] A landfill operator therefore finds its present range of options constrained by its own past actions (the decision to accept certain wastes) even though it could not have foreseen those consequences when the actions occurred. This does not, however, make the rule a retroactive regulation. It is often the case that a business will undertake a certain course of conduct based on the current law, and will then find its expectations frustrated when the law changes. This has never been thought to constitute retroactive lawmaking, and indeed most economic regulation would be unworkable if all laws disrupting prior expectations were deemed suspect.[11]

Moreover, we find this aspect of the agency's interpretation of the derived-from rule to be eminently reasonable. The derived-from rule establishes a presumption: leachate generated from hazardous waste will be presumed hazardous unless it is proved nonhazardous or treated to applicable standards. The reasonableness of that presumption does not vary depending upon the time when the underlying waste was disposed. In fact, the view of the rule

---

10. The agency itself noted that the "EPA does not accept the argument that facilities are better off if they do not collect contaminated leachate, and so will discontinue voluntary collection. Continued release of such leachate exposes the facility to CERCLA liability, common law tort liability, and possibly criminal liability under intentional endangerment statutes." 53 Fed. Reg. 31,149 (August 17, 1988).

11. Commenters who stressed the potential disruption of settled expectations emphasized the plight of Subtitle D landfill operators who have accepted "small quantity generator waste." *See, e.g., Comments of Waste Management of North America* at 10 (J.A. 640). The RCRA provides that Subtitle D landfills, which typically manage nonhazardous solid waste, may accept up to 100 kg/month of hazardous waste from small quantity generators without becoming subject to the hazardous waste regulations of Subtitle C. Commenters feared that these landfill operators would be brought under all of the restrictions of Subtitle C due to their active management of leachate. Such a result, we would note, might have occurred even if the treatment standards applied only to leachate derived from wastes listed as hazardous at the time of disposal. In any event, the commenters' fears appear to have been unfounded. In its preamble to the final rule, the EPA stated that it viewed the derived-from rule as inapplicable to small quantity generator hazardous wastes. *See* 53 Fed.Reg. 31,-149 (August 17, 1988).

urged by the petitioners would seem to create serious enforcement problems. No doubt there are many landfills which have accepted certain listed hazardous wastes both before and after the wastes were listed. Under petitioners' approach, leachate generated from the wastes disposed after listing would be deemed hazardous and would be subject to the treatment standards; leachate derived from previous shipments of the same waste would not. There is, however, no possible way of determining which portions of the collected leachate were generated from particular shipments of the underlying waste.

■ In upholding the EPA rule as a non-retroactive regulation, we do not believe that we have impermissibly sustained the agency's decision on a basis other than that relied upon by the agency itself.[12] The EPA did, it is true, state repeatedly that "hazardous waste listings are retroactive." Read in context, however, these statements mean only that the hazardousness of leachate will depend on the composition of the underlying wastes, not on the time at which those wastes were disposed. The agency emphasized that its action would apply only to the future active management of leachate. The preamble to the final rule stated: "What EPA's reading does is to ensure that once hazardous derived-from residues are collected, their subsequent management will be controlled under the statute designed to control management of hazardous waste. EPA has no other statutory tool for assuring *prospectively* that proper management will occur." 53 Fed.Reg. 31,149 (August 17, 1988) (emphasis supplied). Although the EPA did use the word "retroactive" in a way that careful lawyers would not, we believe that the basis on which the agency acted was congruent in substance (if not in phrasing) with the rationale which we uphold today.

**B. *Contaminated Environmental Media***

**1. Notice and Comment**

■ Petitioners also challenge the EPA's assertion that environmental media (*e.g.,* soil or groundwater) which are contaminated with hazardous wastes will themselves be considered hazardous wastes, and thus will be subject to the land disposal restrictions. Although petitioners appear to press their argument that this measure was adopted in violation of the APA's notice and comment requirements, we believe that the notice and comment argument actually adds nothing to their position. The EPA makes no attempt to defend the contaminated soil rule as a new regulation; the agency does not purport to have weighed the pros and cons of the policy within the course of the 1988 rulemaking.[13] Rather, the agency relies exclusively on the contention that the challenged rule is simply the application to environmental media of regulations adopted in 1980. If the EPA is correct in this assertion, then it was not required to provide notice or to consider comments in 1988. *See American Hospital Association, supra* p. 1534, 834 F.2d at 1045 (interpretive rules, which do not require notice and comment, "are those which merely clarify or explain existing law or regulations") (citations omitted). *See also American Postal Workers Union v. United States Postal Service,* 707 F.2d 548, 560 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984) "the impact of a rule has no bearing on whether it is legislative or interpretative; interpretative rules may have a substantial impact on the rights of individuals"). If the agency is wrong, then it cannot win on this issue no matter how much notice it provided. We therefore consider the merits of petitioners' challenge.

**2. Is Petitioners' Claim Time–Barred?**

The agency makes two related arguments based on the 1980 regulations.

---

12. Such an approach would of course be improper. "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983).

13. In fact, the brief for the EPA emphasizes that the agency did not revisit this issue during the 1988 rulemaking. *See* Brief for EPA at 49.

First, the EPA asserts that these regulations clearly established that contaminated environmental media would be considered hazardous wastes. Therefore, the agency argues, "[t]he Court need not consider petitioners' argument further, since it has been made eight years too late." Brief for EPA at 46. Second, the agency contends that to treat contaminated soil and groundwater as hazardous waste is in any event a reasonable *interpretation* of the 1980 rules. These arguments, while related, have quite different ramifications, and we will consider them in turn.

■ If the 1980 regulations (or the preamble thereto) clearly stated that contaminated environmental media would be covered, then petitioners' challenge would indeed be barred. The EPA correctly notes that the RCRA's ninety-day limit for seeking judicial review of agency regulations is jurisdictional. *See Natural Resources Defense Council v. Nuclear Regulatory Commission*, 666 F.2d 595, 602 (D.C.Cir. 1981). We do not believe, however, that the 1980 rules clearly provided that contaminated environmental media would be considered hazardous wastes. Neither the mixture nor the derived-from rule is by its terms directly applicable to contaminated soil or groundwater.[14] No other portion of the rules plainly applies, and the preamble issued by the agency at that time does not explicitly address the question.

■ Of course the EPA retains broad authority to issue interpretations of its rules which are reasonable though not compelled by the plain language of the rules themselves. And such interpretive statements, as we have seen, are not subject to the notice and comment requirements imposed by the APA. But to say that the agency is interpreting a preexisting regulation does not mean that judicial review of that interpretation is barred simply because a direct challenge to the rule itself would be untimely. The petitioners were required, within ninety days after the promulgation of the 1980 rules, to challenge any aspect of the rules which was clearly discernible from the language of the rules or from the agency's contemporaneous statements. The petitioners were not required, however, to anticipate every construction which the agency might later place upon its regulations.[15] Such an approach to the statutory time limits would impose hardships on individual petitioners; moreover, to require that challengers file these "protective" lawsuits would enmesh courts and agencies in irksome litigation concerning regulatory interpretations which had not been adopted and might never be adopted. Judicial review of an agency's interpretation of its own rules is, as we shall see, highly deferential, but deferential review is not the same as no review at all.

3. Did the Agency Reasonably Interpret the 1980 Regulations?

■ In reviewing the EPA's application of its 1980 rules to contaminated soil, we are guided by two fundamental principles. The first is that "[a]n agency's interpreta-

14. The derived-from rule provides that "any *solid waste* generated from the treatment, storage, or disposal of a hazardous waste, including any sludge, spill residue, ash, emission control dust, or leachate ... is a hazardous waste." 40 C.F.R. § 261.3(c)(2)(i) (emphasis supplied). The mixture rule states that "a mixture of *solid waste* and one or more hazardous wastes listed in Subpart D" will itself be a hazardous waste. 40 C.F.R. § 261.3(a)(2)(iv) (emphasis supplied). For either of these rules to apply directly, soil or groundwater would have to be considered a "solid waste." This does not match the statutory definition: "The term 'solid waste' means any garbage, refuse, sludge ... and other discarded material." 42 U.S.C. § 6903(27).

15. To put it a slightly different way, the question is whether the agency action currently under attack occurred in 1980 or in 1988. If the EPA in 1988 had simply restated a regulatory principle which was clearly expressed in the 1980 rulemaking, then petitioners' challenge would in substance be an attack on the 1980 regulations, and thus would be barred. In our view, however, the EPA's 1988 discussion of contaminated soil is best understood as a gloss on, not a reiteration of, the 1980 rules. The line is admittedly a fine one: the contaminated soil principle is sufficiently linked to the 1980 regulations to qualify as an interpretive rule, yet is a sufficiently significant extension of the earlier regulations that it qualifies as a new agency action triggering its own statutory review period.

tion of its own regulations will be accepted unless it is plainly wrong." *General Carbon Company v. Occupational Safety and Health Review Commission,* 860 F.2d 479, 483 (D.C.Cir.1988). The second is that on "a highly technical question ... courts necessarily must show considerable deference to an agency's expertise." *MCI Cellular Telephone Company v. FCC,* 738 F.2d 1322, 1333 (D.C.Cir.1984). Taken together, these principles counsel extreme circumspection in our review of the agency's action.

The agency's rule, adopted in 1980, provides that "[a] hazardous waste will remain a hazardous waste" until it is delisted.[16] *See* 40 C.F.R. §§ 261.3(c)(1), 261.3(d)(2). The petitioners argue in essence that an agglomeration of soil and hazardous waste is to be regarded as a new and distinct substance, to which the presumption of hazardousness no longer applies. The agency's position is that hazardous waste cannot be presumed to change character when it is combined with an environmental medium, and that the hazardous waste restrictions therefore continue to apply to waste which is contained in soil or groundwater. Certainly the EPA's position appears plausible on its face. Moreover, several other factors support the agency's interpretation of its rules.

In its preamble to the 1980 regulations, the agency sought to explain the circumstances under which a hazardous waste would cease to be a hazardous waste. The agency stated that a waste, once deemed hazardous, would ordinarily be presumed to retain its hazardous character. The EPA explained: "As a practical matter, this means that facilities which store, dispose of or treat hazardous waste must be considered hazardous waste management facilities for as long as they continue to contain hazardous waste and that any wastes removed from such facilities—in-cluding spills, discharges or leaks—must be managed as hazardous wastes." 45 Fed. Reg. 33,096 (May 19, 1980). The preamble did not specifically refer to contaminated environmental media, and it is certainly true that hazardous wastes may spill or leak into solid waste rather than into soil or groundwater. Clearly, though, the EPA's current treatment of contaminated soil is entirely consistent with the 1980 preamble's insistence that hazardous wastes will ordinarily be presumed to remain hazardous.

The EPA's approach to contaminated environmental media is also consistent with the derived-from and mixture rules established in 1980. *See* 40 C.F.R. §§ 261.-3(c)(2)(i), 261.3(a)(2)(iv).[17] These rules provide that a hazardous waste will continue to be presumed hazardous when it is mixed with a solid waste, or when it is contained in a residue from treatment or disposal. The derived-from and mixture rules do not, it is true, apply by their own terms to contaminated soil or groundwater. *See supra,* p. 1538 n. 14. They nevertheless demonstrate that the agency's rule on contaminated soil is part of a coherent regulatory framework. It is one application of a general principle, consistently adhered to, that a hazardous waste does not lose its hazardous character simply because it changes form or is combined with other substances. In promulgating the mixture rule, the agency did not presume that every mixture of listed wastes and other wastes would in fact present a hazard. Rather, the agency reasoned that "[b]ecause the potential combinations of listed wastes and other wastes are infinite, we have been unable to devise any workable, broadly applicable formula which would distinguish between those waste mixtures which are and are not hazardous." 45 Fed.Reg. 33,095 (May 19, 1980). The EPA therefore concluded that

---

**16.** In filing a delisting petition, a petitioner seeks to convince the EPA that its particular form of the waste, although it falls within the regulatory definition of hazardous waste, does not in fact pose a hazard. *See* 40 C.F.R. §§ 260.20, 260.22. *See also McLouth,* 838 F.2d at 1319.

**17.** Petitioners do not challenge the mixture or derived-from rule. We therefore presume the validity of these rules in the current proceeding, although we recognize that the regulations were the subject of a timely challenge which is presently pending before this court. *See supra,* p. 1530 n. 4.

it was fair to shift to the individual operator the burden of establishing (through the delisting process) that its own waste mixture is not hazardous. Precisely the same logic applies to combinations of hazardous waste and soil or groundwater.

 The EPA also asserts that its interpretation of the 1980 rules as covering contaminated soil and groundwater, though not previously published in the Federal Register, has frequently been applied to individual cases during the past decade. The agency cites several instances in which it has received petitions to delist environmental media contaminated with hazardous waste; such delisting would be unnecessary unless the contaminated soil or groundwater were deemed hazardous waste to begin with. *See* Brief for EPA at 48 & n. 48. We find these examples persuasive. We recognize that the acquiescence of particular companies does not signal the acquiescence of the entire industry, nor do we suggest that the petitioners are somehow barred from contesting this interpretation simply because it has been applied to others in the past. We nevertheless believe that, when we assess the reasonableness of the EPA's interpretation of its own rule, the consistency with which that interpretation has been applied in the past weighs in favor of the agency. *Cf. NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 108 S.Ct. 413, 421 n. 20, 98 L.Ed.2d 429 (1987) (in determining whether an agency has reasonably interpreted a governing statute, courts should "consider the consistency with which an agency interpretation has been applied").[18]

The EPA's interpretation is also buttressed by one provision of the Hazardous Solid Waste Amendments of 1984, 42 U.S. C. § 6924(e). Congress there provided that certain specified solvents and dioxins would be prohibited from land disposal. 42 U.S.C. §§ 6924(e)(1), 6924(e)(2). The statute fur-

ther provided that, for a two-year period after the effective date of the ban, the prohibition "shall not apply to any disposal of contaminated soil or debris resulting from a response action taken under section 9604 or 9606 of this title or a corrective action required under this subchapter." 42 U.S.C. § 6924(e)(3). This statutory exemption would of course have been superfluous unless contaminated soil would otherwise fall within the terms of the ban; the statute itself, however, made no explicit reference to a prohibition on land disposal of contaminated soil. This provision at least suggests that Congress assumed that the hazardousness of an underlying waste would be imputed to contaminated environmental media.

We need not decide whether any of these factors, or all of them taken together, would *compel* the conclusion that soil or groundwater contaminated with hazardous waste is itself a hazardous waste as defined by EPA regulations. We do believe, however, that, given the agency's broad discretion to interpret its own rules, it was entirely reasonable for the EPA to arrive at that conclusion. We therefore must sustain the agency's position.

### III. CONCLUSION

We find that both of the EPA's policies under attack here represent reasonable exercises of agency discretion. The "retroactivity" principle does not in fact constitute retroactive rulemaking at all: the rule announced in August of 1988 will impose regulatory consequences only on leachate management which takes place after that time. The agency might perhaps be accused of inartful phrasing in the explication of its policy, but in substance its decision lay well within the bounds of its lawful authority. The EPA's approach to contaminated soil is also reasonable and is entirely consistent with the agency's general regu-

---

18. As one petitioner notes, some of these delisting petitions were filed "under protest": companies requested delisting of their contaminated soils while denying that such delisting was required by the regulations. *See* Reply Brief of American Wood Preservers Institute at

3–4 n. 4 (citing Delisting Petition of Vulcan Chemicals (J.A. 967)). This fact is of marginal significance, however, since our focus is on the consistency of the agency's interpretation rather than on the acquiescence of the regulated community.

latory framework, which emphasizes that a continuing presumption of hazardousness attaches to hazardous waste which changes form or is combined with other substances. Finally, the agency did not violate the notice and comment requirements imposed by the Administrative Procedure Act. The petitions for review are accordingly

*Denied.*

